Steve Ray FUGATE, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 98–SC–313–MR.

Supreme Court of Kentucky.

June 17, 1999.

Susan Jackson Balliet, Assistant Public Advocate, Frankfort, KY, for appellant.

A.B. Chandler, III, Attorney General, Ian G. Sonego, Assistant Attorney General, Dennis W. Shepherd, Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a judgment based on a jury verdict which convicted Fugate of murder and first-degree burglary. He was sentenced to life in prison on the murder charge and ten years on the burglary charge with the sentences to run concurrently.

The principal issue in this case is whether the court should reconsider the method of admitting DNA evidence in trial courts. Specifically, the issue is whether the court should decide that DNA evidence is admissible *per se* and whether it should abandon the case-by-case approach established in *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100 (1995). Fugate also presents four other questions as follows: Whether the trial judge permitted Fugate to voir dire the jury on the full range of penalties; whether certain jurors should have been struck for cause; whether Fugate should have been granted a change of venue and whether he was entitled to a directed verdict.

At trial, an eye witness testified that he and Fugate went to the victim's trailer to purchase a bag of marijuana and to see the new baby of a friend. Fugate sold the victim some Valium and an argument followed in which Fugate accused the victim of shortchanging him. Fugate shot the victim in the leg and the victim cried "you had better kill me now." Fugate then shot the victim twice in the head, killing him. The gun was never found. Fugate has consistently denied being at the trailer on the night of the murder. The only physical evidence linking Fugate to the crime scene was blood found on his shoes which was identified, through DNA evidence, as coming from the victim.

Pursuant to KRE 104 and 702, the trial judge conducted a pretrial hearing on whether the prosecution expert, Warnecke, was qualified to testify as an expert and

whether the results of the tests she conducted would be admissible at trial. At the hearing, Fugate objected to the qualifications of the witness as an expert who could testify as to whether DNA testing satisfies the foundation for the admissibility of such evidence pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial judge overruled the defense objections and found that the DNA evidence was admissible.

Fugate argues that the trial judge abused his discretion in permitting Warnecke to testify as an expert who was able to demonstrate the general acceptance of DNA testing within the scientific community. Fugate contends that Warnecke does not have an adequate educational background to be qualified as an expert. He also relies on *Commonwealth v. Petrey*, Ky., 945 S.W.2d 417 (1997), in which this Court reversed the Court of Appeals on the qualification issue because Petrey had failed to object to the qualifications of the expert at a pretrial hearing. The Court of Appeals had held that Warnecke was not qualified to testify as an expert regarding the general acceptance and reliability of such evidence in the relevant scientific community. Consequently, Fugate claims that because the expert's credentials were objected to at the pretrial hearing, this Court should take judicial notice of the opinion of the Court of Appeals which disqualified the expert from testifying.

Fugate also contends that the expert improperly testified as to the error rate of this particular laboratory rather than as to the error rate of a particular type of DNA method.

The trial which is appealed from is the prosecution's fourth attempt to try Fugate for murder and burglary. A mistrial was declared in the first trial when the prosecution learned that a juror had improper contacts with the family of the victim. The second trial resulted in a hung jury. The third trial was ended when the jury panel fell below the statutory number.

The fourth trial took two days and resulted in conviction on the murder and burglary charges. This appeal followed.

In determining whether the trial judge properly admitted the evidence, we may consider not only the expert evidence of record, but also judicial opinions in other jurisdictions as well as pertinent legal and scientific commentaries. The factors are designed to ensure that the expert's testimony rests on a reliable foundation and is relevant. *Wood v. State*, Okla.Crim.App., 959 P.2d 1 (1998).

■ Our review of the DNA evidence is limited to the methods of DNA analysis used in this case which are the PCR and the RFLP analysis. Scientific evidence requires expert testimony because it is based on theories and techniques that are not within the general knowledge of either the courts or the juries. If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion. *See* FRE 702, which Kentucky has adopted in KRE 702 based on the decision of the United States Supreme Court in *Daubert, supra.*

In *Daubert*, the United States Supreme Court held that *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), commonly known as the "general acceptance" rule, has been replaced in federal courts by FRE 702 with regard to the admissibility of all expert opinion testimony. *Daubert* established an analytical methodology for trial courts to determine whether proposed scientific expert opinion is based on scientific knowledge and is therefore sufficiently reliable to be admitted into evidence for consideration by the finder of fact. Among the many factors that will bear on the inquiry is whether the proposed scientific opinion is scientific knowledge.

This Court adopted the *Daubert* formula for admitting scientific evidence in *Mitch-*

*ell, supra,* in which this Court refused to hold that DNA evidence was *per se* admissible. Instead, we held that the admissibility was to be determined on a case-by-case basis. Whenever a party wishes to introduce DNA evidence, the trial judge must conduct a preliminary hearing pursuant to KRE 104, using the standard set out in *Daubert* to determine the admissibility of the evidence.

The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but also reliable. In determining the reliability of novel scientific evidence, the trial court should consider whether the theory or technique can be and has been tested; whether the technique has been subject to peer review and publication; the known or potential rate of error and whether the technique is generally accepted. *Mitchell; Daubert.* Any alleged deficiencies in testing must go to the weight rather than to its admissibility. *United States v. Beasley,* 102 F.3d 1440 (8th Cir.1996).

*Petrey, supra,* reversed an opinion of a panel of the Court of Appeals that held that the same expert used in this case was not qualified. This Court reversed on grounds that the issue was not preserved and did not rise to the level of palpable error. Fugate now argues that *Petrey* is distinguishable because the issue of qualifications of an expert has been properly preserved.

In the case now under appeal, Warnecke testified that she had a Bachelor of Science degree from Western Kentucky University, with a major in biology and a minor in chemistry; that she had graduate level course credits from the University of Virginia in a course in DNA analysis methods and had studied DNA analysis at the F.B.I. Academy in Quantico, Virginia; that she had received graduate credit in biochemistry from the University of Kentucky, and that she had attended numerous symposiums, seminars and workshops regarding DNA analysis. She indicated that she was a member of the American Academy of Forensic Scientists and a member of the Midwestern Association of Forensic Scientists. She also stated that she was a member of the Technical Working Group on DNA Analysis Methods (TWGDAM) established by the F.B.I. to advise it and state forensic laboratories regarding DNA testing procedures. Warnecke also indicated that she had lectured on DNA technology at the college level and that she had submitted papers to be published in the Journal of Forensic Sciences regarding DNA analysis using the PCR method. She indicated that she had been performing DNA analysis for the Kentucky State Police Laboratory since 1990 and had testified in court on DNA analysis in approximately 40 cases.

The trial judge found Warnecke qualified as an expert because of her seven years of personal experience in conducting DNA analysis with the Kentucky State Police Laboratory, the graduate level courses she had taken and her knowledge, experience, training and education.

The decision as to the qualifications of an expert rests in the sound discretion of the trial court and we will not disturb such ruling absent an abuse of discretion. *Kentucky Power Co. v. Kilbourn,* Ky., 307 S.W.2d 9 (1957); *Ford v. Commonwealth,* Ky., 665 S.W.2d 304 (1983). This Court in pre-KRE opinions and the KRE 702 section recognized that an individual can be qualified as an expert without possessing a particular academic degree. *Kilbourn, supra; Ford, supra.*

*Sholler v. Commonwealth,* Ky., 969 S.W.2d 706 (1998), upheld a determination by the trial judge that Warnecke was qualified as an expert regarding DNA testing and comparison procedures. In *Sholler, supra,* this Court stated that there was evidence in the record that the same particular expert was qualified to conduct DNA tests and to report the results. It is not clear whether an objection to the qualifications of the expert to testify to the foundation for admissibility required by

*Daubert* and *Mitchell* was ever raised in *Sholler.*

We conclude that the determination by the trial judge that Warnecke was qualified to testify as an expert was not an abuse of discretion.

■ Warnecke testified concerning the DNA analysis procedures using both the PCR and RFLP methods. She explained that with respect to this case, she had used both the PCR and the RFLP procedures. She noted how the TWGDAM committee served as an advisory group for the forensic laboratories of 48 of the 50 states and the F.B.I. She also referred to three different articles that had been published in peer review journals regarding DNA analysis. She also testified that both methods of DNA analysis had been found to be scientifically reliable in the scientific and peer review articles.

*Perry v. Commonwealth, ex rel Kessinger,* Ky., 652 S.W.2d 655 (1983), held that the trial judge erred in denying the prosecution's motion to require the defendant to submit to HLA blood testing. *Perry, supra,* determined that the HLA testing had gained general acceptance within the relevant scientific community. Such determination was made exclusively through the review of foreign cases so holding. Consequently, under the principles established by *Perry,* this Court can rely on case law from other jurisdictions to determine whether RFLP and PCR DNA procedures have gained general acceptance in the relevant scientific community.

The admissibility of DNA evidence produced by the RFLP method was in question in *State v. Marcus,* N.J.Super.Ct.App.Div., 294 N.J.Super. 267, 683 A.2d 221 (1996). Although at that time New Jersey used the *Frye* test, we believe the approach has validity. In *Marcus,* the New Jersey courts identified three ways in which a party can meet the burden of demonstrating that the scientific technique that produced the evidence has gained general acceptance within the relevant scientific community. The standards were as follows: 1) the test of knowledgeable experts; 2) authoritative literature; and 3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony. *See Marcus* at 225.

The reliability and validity of expert testimony in DNA comparison analysis using the RFLP method has been repeatedly recognized by federal courts. *See United States v. Bonds,* 12 F.3d 540 (6th Cir.1993); *United States v. Martinez,* 3 F.3d 1191 (8th Cir.1993); *United States v. Chischilly,* 30 F.3d 1144 (9th Cir.1994); *United States v. Davis,* 40 F.3d 1069 (10th Cir.1994); *United States v. Jakobetz,* 955 F.2d 786 (2nd Cir.1992). A large number of state courts have also upheld DNA comparison using the RFLP method in accordance with procedures and guidelines approved by the F.B.I. *See Commonwealth v. Blasioli,* Pa., 552 Pa. 149, 713 A.2d 1117 (1998); *State v. Williams,* Iowa, 574 N.W.2d 293 (1998); *State v. Freeman,* Neb., 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Loftus,* S.D., 573 N.W.2d 167 (1997); *People v. Hickey,* Ill., 178 Ill.2d 256, 227 Ill.Dec. 428, 687 N.E.2d 910 (1997); *Commonwealth v. Fowler,* Mass., 425 Mass. 819, 685 N.E.2d 746 (1997); *State v. Hummert,* Ariz., 933 P.2d 1187 (1997); *State v.. Boles,* Ariz., 188 Ariz. 129, 933 P.2d 1197 (1997); *State v. Copeland,* Wash., 130 Wash.2d 244, 922 P.2d 1304 (1996); *People v. Miller,* Ill., 173 Ill.2d 167, 219 Ill.Dec. 43, 670 N.E.2d 721 (1996); *State v. Fleming,* Me., 698 A.2d 503 (1997); *Armstead v.. State,* Md., 342 Md. 38, 673 A.2d 221 (1996); *State v. Weeks,* Mont., 270 Mont. 63, 891 P.2d 477 (1995); *Lindsey v. People,* Colo., 892 P.2d 281 (1995); *Taylor v. State,* Okla.Crim., 889 P.2d 319 (1995); *State v. Anderson,* N.M., 118 N.M. 284, 881 P.2d 29 (1994); *State v. Bloom,* Minn., 516 N.W.2d 159 (1994).

DNA analysis using the PCR method has also been recognized as valid and scientifically reliable. *See the following cases: United States v. Beasley,* 102 F.3d 1440 (8th Cir.1996), collecting cases; *State*

*v. Tankersley,* Ariz., 191 Ariz. 359, 956 P.2d 486 (1998), collecting cases; *State v. Stills,* N.M., 125 N.M. 66, 957 P.2d 51 (1998); *Bolin v. State,* Nev., 114 Nev. 503, 960 P.2d 784 (1998); *State v. Jackson,* Neb., 255 Neb. 68, 582 N.W.2d 317 (1998); *State v. Begley,* Tenn., 956 S.W.2d 471 (1997); *Commonwealth v. Vao Sok,* Mass., 425 Mass. 787, 683 N.E.2d 671 (1997); *State v. Harvey,* N.J., 151 N.J. 117, 699 A.2d 596 (1997), which included a detailed discussion of DNA testing procedures and statistical calculation; *State v. Isley,* Kan., 262 Kan. 281, 936 P.2d 275 (1997); *State v. Lyons,* Or., 324 Or. 256, 924 P.2d 802 (1996); *United States v. Shea,* 957 F.Supp. 331 (D.N.H.1997). *Shea, supra,* was affirmed by the First Circuit in *United States v. Shea,* 159 F.3d 37 (1998), and the First Circuit adopted the opinion of the District Court on the question. The opinion of the District Court contained a detailed examination of the procedures used by the F.B.I. laboratory in conducting DNA PCR analysis and statistical probability calculation.

Indiana, in *Smith v. State,* 702 N.E.2d 668 (1998), unanimously upheld the reliability and admissibility of DNA comparison procedures by the PCR process using the DQ alpha, polymarker, and D1S80 methods of comparison to affirm convictions for murder and robbery.

It is clear that the PCR method of DNA analysis has been subjected to extensive peer review. One court has estimated that over 4,000 published scientific articles exist addressing the merits of the method. *State v. Begley,* Tenn., 956 S.W.2d 471 (1997) *citing State v. Lyons,* Or., 324 Or. 256, 924 P.2d 802 at 813 (1996).

This Court is not a stranger to the problem of the admissibility of scientific evidence in regard to DNA factors. *Harris v. Commonwealth,* Ky., 846 S.W.2d 678 (1992), was rendered just prior to the *Daubert* decision by the U.S. Supreme Court and relied on the *Frye* standards. The majority opinion upheld a conviction which included charges of first-degree rape and attempted first-degree sodomy and permitted the admission of DNA tests, holding that it was not an abuse of discretion. A concurring opinion written by Justice Wintersheimer and joined by Justice Spain, the author of the majority opinion, noted that the Congressional Office of Technology and Assessment reported that 38 states have found DNA testing to be accepted among the scientific community and noted that it was obvious that the overwhelming weight of medical and legal authority accepts results of properly conducted DNA testing. In the case we are now considering, we have limited our review to the PCR and RFLP methods.

No evidence was presented by Fugate to the trial court which contradicted the testimony regarding DNA analysis using the RFLP and PCR methods. Defense counsel did not request an opportunity to present such evidence.

We are persuaded by authoritative case law from other jurisdictions that the reliability of DNA comparison analysis using the RFLP and PCR methods has been sufficiently established as to no longer require a *Daubert* hearing. Indeed, the weight of the evidence is overwhelming. Further, we must conclude that the determination by the trial judge that the expert was qualified to testify as an expert was correct. The admission of such evidence was not an abuse of discretion by the trial judge.

In view of the fact that this Court will no longer require a pretrial *Daubert* hearing in every case involving the admission of DNA evidence using the RFLP and PCR methods of analysis, to that extent, the decision in *Mitchell,* is overruled. The decision in the federal case of *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, —— L.Ed.2d —— (1999), has no application in this specific case.

██ The admission of DNA evidence without a pretrial *Daubert* hearing does not allow the blanket admissibility of all DNA evidence. We hold that the DNA

comparison analysis using the RFLP and PCR methods is admissible without being the subject of a pretrial *Daubert* hearing. However, the evidence in question is still subject to challenge at trial. The opposing party could question the handling of the samples, the chain of custody, the accuracy of the procedures, the quality of training of the particular person or persons who conducted the actual tests and whatever other challenge could be made to the credibility of the evidence. Such complaint would go to the weight of the evidence, not its admissibility.

## II

Fugate claims that the trial judge improperly refused to allow him to voir dire the jury on the full range of penalties. He argues that under *Shields v. Commonwealth*, Ky., 812 S.W.2d 152 (1991), he was entitled to inform the jury that the minimum punishment for the murder charge was 20 years in prison and that the minimum punishment for burglary was 10 years in prison. The trial judge directed the defendant to mention only the terms "minimum and maximum" without mentioning any specific number of years. Defense counsel declined because it would have been meaningless.

Based on the language of *Shields, supra,* this Court is convinced that the defense was entitled to inform the jury panel that under KRS 532.030, the minimum punishment for murder was 20 years and the minimum penalty for first-degree burglary was 10 years. Fugate received the maximum sentence of life imprisonment because the prosecution did not seek the death penalty. A majority of this Court has previously announced that because a defendant received the maximum sentence on all charges, we cannot say that it was harmless error to deny serious inquiry into whether the jurors were open to consideration of a lesser sentence within the range of possible penalties. *Anderson v. Commonwealth*, Ky., 864 S.W.2d 909 (1993); *Cf. Samples v. Commonwealth*, Ky., 983

S.W.2d 151 at 153 (1998). Fugate is not claiming prejudice regarding the burglary sentence because he received only 10 years on that charge. He concedes that this claim of error relates only to the murder charge. There is no persistent felony offender count involved in this case.

## III

Fugate argues that the trial judge committed reversible error in denying the defense challenge of three jurors for cause. None of the three served on the jury because all were removed by peremptory challenges by the defense. Fugate claims that he was prejudiced by this action because he would have struck three other jurors. He claims that he was forced to use peremptory challenges to eliminate these jurors. Fugate contends that all three of these jurors, or one of their close family members had previously been represented by the prosecutor. We must agree. *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252 (1993).

One juror said that he had a living will prepared by the prosecutor four or five years before trial in this case and had used the prosecutor to draw incorporation papers for a Habitat organization about the same time. The juror said he was satisfied with the representation and might use the attorney again. The juror said he did not believe his association with the prosecutor would cause him to be biased in favor of the prosecution. The trial judge refused to strike this juror for cause. We must disagree and reverse and remand. We agree with the opinion of the Court of Appeals expressed in *Riddle v. Commonwealth*, Ky.App., 864 S.W.2d 308 (1993), that a trial court is required to disqualify for cause prospective jurors who had a prior professional relationship with a prosecuting attorney and who profess that they would seek such a relationship in the future.

Another juror played Little League baseball and went to high school

with a witness for the prosecution ten years before trial. The juror denied any continuing social relationship with the witness. The juror stated that he did not think the relationship would affect his judgment in the case. When asked if his relationship with the witness would cause him to give a "head start," the juror said "probably." Later the juror said, "Well, I—you know, I ain't seen him in years, you know, but I did kind of know him at one time." Later, the juror also said, "Well, it might kind of affect it you know." Ultimately, the juror said he didn't think it would be harder for him to think the witness was lying. It was error for the trial judge to deny the motion to strike for cause.

 A third juror had contact with the prosecutor in regard to a pending case that involved the passing of a bad check at the business he managed. The juror said he was satisfied with the prosecutor's work and had become close enough to him to refer to him by his first name, calling him "Darryl" during voir dire. The juror said that the contact would not affect his judgment whatsoever. The trial judge erroneously denied the motion to strike for cause. *Cf. Riddle, supra.*

 As a result of the refusal of the trial judge to strike these three witnesses for cause, Fugate was unable to use a peremptory challenge to remove three other jurors from the panel. One was removed by peremptory strike by the prosecution, but two others served as jurors. One of the jurors had been represented by the prosecutor on a traffic ticket three or four years before and she denied it would have any effect on her judgment, but her husband was satisfied with the representation.

 The right to a completely impartial jury is protected by Section Eleven of the Kentucky Constitution as well as the Sixth and Fourteenth Amendments to the U.S. Constitution. *Paenitz v. Commonwealth,* Ky., 820 S.W.2d 480 (1991). A

juror should be disqualified when the juror has a close relationship with a victim, a party or an attorney, even if the juror claims to be free from any bias. *Butts v. Commonwealth,* Ky., 953 S.W.2d 943 (1997).

 Under all the circumstances, we must conclude that the complex issue of whether to strike a juror for cause is a troubling one. Certainly, the question of the sound discretion of the trial judge must be given great deference. *Peters v. Commonwealth.* Ky., 505 S.W.2d 764 (1974). The exercise of the sound discretion of the trial judge must be accomplished consistent with the right of the defendant to a fair and impartial jury. Composition of the jury is always vital to the defendant in a criminal prosecution and doubt about unfairness is to be resolved in his favor. *Randolph v. Commonwealth,* Ky., 716 S.W.2d 253, 255 (1986). Consequently, it was reversible error to refuse to strike the three jurors for cause.

### IV

 The trial judge properly denied the defense request for a change of venue. Fugate sought a change of venue in this trial and in previous trials. He claimed heavy newspaper coverage. The trial judge denied the motion for change of venue, but granted the motion for individual voir dire regarding any pretrial publicity. The trial judge also allowed reconsideration of the venue matter after the individual voir dire was completed.

An exhaustive review of the record does not reveal any problem with widespread community knowledge of this case. When a prospective juror stated that they heard about the case, Fugate had sufficient opportunity to challenge the prospective juror if desired.

 A change of venue is warranted where a fair trial is not possible. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997). The defense must show that there

has been press or media coverage prejudicial to the defendant and that such coverage took place prior to the trial and the coverage is reasonably likely to prevent a fair trial. *Bowling, supra, citing Brewster v. Commonwealth,* Ky., 568 S.W.2d 232 (1978). The trial judge has discretion in such a determination and it will not be lightly disturbed. *Cf. Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985). The mere fact that the jurors may have heard, talked or read about a case is not sufficient to sustain a motion for change of venue in the absence of a showing that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. *Brewster.* A review of the record in this case indicates no specific evidence of pretrial press or media coverage that was prejudicial to Fugate. The trial judge did not abuse his discretion.

## V

The trial judge correctly denied the defense motions for directed verdicts. Fugate sought a directed verdict at the close of the prosecution's case on the grounds that all the Commonwealth had demonstrated was that Fugate was present at the crime scene. On the burglary charge, Fugate claimed that there was no evidence that he intended to commit a crime when he entered the victim's home. The trial judge denied the motions for directed verdicts which were made both at the end of the prosecution and defense cases.

The long standing Kentucky rule has been that the standard for appellate review of a denial of a motion for directed verdict based on insufficient evidence is that if under all the evidence as a whole it would be clearly unreasonable for a jury to find the defendant guilty, a directed verdict of acquittal should be granted. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991); *Commonwealth v. Sawhill,* Ky., 660 S.W.2d 3 (1983); *Trowel v. Commonwealth,* Ky., 550 S.W.2d 530

(1977). A review of the evidence before the trial court both at the close of the prosecution's case-in-chief and at the end of the entire guilt phase presentation was clearly sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant was guilty. *Cf. Benham, supra.* This analysis applies to both the murder and burglary charges. The fact that the murder victim permitted Fugate to enter his trailer does not provide the basis for a directed verdict on burglary in this case. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997), stated that the privilege granted to one doing business ceases when the licensee commits acts, such as crimes, inconsistent with the business. This rationale applies to the personal dwelling as well. *See Tribbett v. Commonwealth,* Ky., 561 S.W.2d 662 (1978).

Reliance by Fugate on *Hedges v. Commonwealth,* Ky., 937 S.W.2d 703 (1996), which was raised only in the reply brief, is misplaced. The principles of *Tribbett* still apply in the situation presented here. There was testimony that Fugate went to the victim's trailer on a purely social visit so that the victim could see the Jennings baby and invited a small group, including Fugate, into his trailer to socialize. While there, Fugate sold the victim some Valium and an argument ensued in which Fugate accused the victim of short changing him. Fugate then shot the victim three times killing him. Subsequent to that, there was testimony from an eye witness that Fugate ransacked the victim's trailer looking for something to steal and tore the victim's wallet off its chain, taking the cash and remarking "I can't believe I killed him for 18 dollars." Fugate denied that he was even at the scene of the murder to Kentucky State Police.

It should be noted that in *Hedges, supra,* the majority observed:

To prevent any misunderstanding, it is important to say what this case does not hold. We do not hold or suggest that if one is lawfully admitted to the premises of another, he thereafter has

carte blanche to engage in criminal conduct. Not at all. If a lawfully admitted person commits assault, or theft, or any other crimes, he may be prosecuted for those crimes.

*Hedges* at 707.

The trial judge correctly denied both motions for directed verdict.

The judgment of conviction is reversed and this case is remanded to the circuit court for re-trial in which the DNA evidence is to be treated in a manner consistent with Part I of this Opinion.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, KELLER and WINTERSHEIMER, JJ., concur.

STUMBO, J., concurs in result but would retain the case by case approach.