**Vance WILHITE, et al., Appellant,**

**v.**

**ROCKWELL INTERNATIONAL CORPORATION, Appellees.**

**No. 2000–SC–0142–DG.**

Supreme Court of Kentucky.

May 16, 2002.

As Modified on Grant of Rehearing
Sept. 26, 2002.

Charles L. Cunningham, Jr., Michael O. McDonald, Louisville, John W. Don Barrett, Bartlett Law Offices, Lexington, W. Patrick Murray, Steven C. Bechtel, Charles E. Fell, Jr., Murray & Murray Co., LPA, Sandusky, OH, Thomas A. Noe, III, Russellville, Joe C. Savage, Savage, Garmer & Elliott, PSC, Lexington, Counsel for Appellants.

Virginia Hamilton Snell, Mark Stephen Pitt, Donald J. Kelly, John Anthony Goebel, Wyatt, Tarrant & Combs, Louisville, Evan M. Tager, Andrew L. Frey, Charles A. Rothfield, Mayer, Brown & Platt, Washington, DC, Counsel for Appellee.

LAMBERT, Chief Justice.

Evidence presented at trial established that Rockwell negligently or intentionally permitted the escape of PCBs into Town Branch which flowed into Mud River and thereby caused low level contamination of Appellants' real properties. At trial, Appellants sought compensation for the fair market value of their properties due to PCB contamination and the jury awarded compensation based on total destruction of the properties. The Court of Appeals determined, and we agree, that the testimony of Appellants' principle damage witness, Mr. Snyder, failed to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[1] *Kumho Tire Co. v. Carmichael*[2] and *Goodyear Tire and Rubber Co. v. Thompson,*[3] and that it should have been excluded. The Court of Appeals determined that exclusion of Snyder's testimony required entry of judgment for Rockwell, believing that the landowners had simply

**1.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**2.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**3.** Ky., 11 S.W.3d 575 (2000).

failed to prove by competent evidence that their property was rendered worthless. While we agree that the evidence of total destruction was erroneously admitted, there was evidence that PCBs were deposited on some or all of the landowners' properties by Rockwell and other evidence indicated some diminution of its value. We must determine, therefore, whether this failure of proof of worthlessness requires dismissal as Rockwell contends, or whether the landowners are entitled to a new trial without the inadmissible evidence.

Appellants, a group of landowners owning land adjacent to the Town Branch Creek and Mud River, filed suit against Appellee, Rockwell International, alleging negligence, nuisance and trespass. From 1956 to 1989, Rockwell operated a die cast plant in Russellville. In 1956, when the plant opened, it began using Pydraul, a hydraulic fluid containing polychlorinated biphenyls, (PCBs).[4] Some of this fluid reached Town Branch Creek and Mud River. Over time, periodic floods deposited PCBs onto the floodplains of these waterways, Appellants' real properties. It is for this PCB contamination that Appellants sought compensation.

In the trial court, the jury rendered a verdict for Appellants awarding them $7,566,118.00 in compensatory damages, the exact amount proven to be the unimpaired fair market value of their properties. The jury also awarded $210 million in punitive damages, the exact amount Appellants' counsel argued to be the cost to remediate the land. Judgment in accordance with the jury verdict was duly entered.

Rockwell's motion for judgment notwithstanding the verdict and a new trial was denied by the trial court. The trial court held, after hearing oral arguments on the motion, that there were reasonable inferences available to support the award of compensatory and punitive damages.

■ Rockwell appealed to the Court of Appeals arguing, among other things, that Appellants had failed to show damage to their properties and that Appellants' principal expert's testimony should not have been admitted. The Court of Appeals held that Appellants' expert witness, Charles G. Snyder, should not have been permitted to testify in various respects. Judge Huddleston's opinion for the Court of Appeals comprehensively analyzed the Snyder testimony and we quote liberally from that opinion.

The award of compensatory damages in this case rests almost entirely on the testimony of Charles Snyder. Snyder graduated from Miami University in Oxford, Ohio, with a degree in English and history. From 1976 through 1980, he was a real estate broker in the state of Ohio. Since 1980, he has been a real estate appraiser. In that capacity, he has conducted several hundred commercial appraisals and some 5,000 single family home appraisals for law firms, banks and other lending institutions, and various governmental agencies. He is a licensed Ohio appraiser and holds a temporary Kentucky license and is a member of the Appraisal Institute (M.A.I.). The trial court correctly ruled that he is a qualified appraiser who could give his expert opinion as to the post-contamination value of the landowners' properties.

---

4. PCBs have been designated by Congress and the state of Kentucky as hazardous substances. They are potential carcinogens although there is no conclusive evidence of their carcinogenic effects. Since 1976, the manufacture and use of PCBs has been heavily regulated and restricted by the federal government.

The unimpaired value of the landowners' properties—$7.5 million, a sum not in dispute—was determined by another appraiser, Larkin Summers. Appraisers, according to Snyder, generally use one of three methods to determine the fair market value of a piece of property: (1) the market data approach; (2) the cost approach; or (3) the income capitalization approach; or they use a combination of these methods.

. . . .

Snyder has virtually no experience appraising contaminated properties and none valuing contaminated farms in Kentucky or elsewhere. However, after attending seminars, conducting research and conferring with two other Ohio appraisers, he developed an empirical model for use in this case rather than using one of the accepted valuation methods. Snyder admitted that he is not an expert on PCBs and, indeed, has no knowledge of the safe levels of PCBs. However, he opined that flood plain property that has any level of PCB contamination is worthless. This is so, according to Snyder, because a responsible person would not farm or otherwise use PCB contaminated property until it has been thoroughly tested and, if necessary, remediated. A farm must be considered as an economic unit. Thus, a farm containing a contaminated flood plain has a negative value since the owner may be responsible for remediating the flood plain at great cost. Furthermore, even in the absence of proof of the extent of PCB contamination, the flood plain should be fenced off from the rest of the property to prevent people and animals from going upon it. Snyder admitted that this was merely his subjective opinion and pointed to no scientific evidence to support his view.

Snyder acknowledged a complete lack of knowledge of the effect of PCB deposits on real property and had no idea whether at some level PCBs are not hazardous to people, animals or crops. Snyder agreed that eleven properties interspersed among the properties at issue in this case had been sold on the open market after it became widely known that Rockwell had released PCBs into the streams abutting them,[5] and that in every instance the properties sold at fair market value [6] with no discount for PCB contamination. His view was that although the buyers of these properties were informed that the flood plains of the properties had been subjected to PCB contamination, the buyers were not truly informed of the risk of purchasing such properties. Some did not consider themselves at risk and others thought Rockwell would remediate the property they purchased. In one instance, the buyer and seller agreed to split any award obtained from Rockwell, and in another, one of the plaintiffs in this action bought an adjoining farm while this lawsuit was pending. In short, Snyder found no sales of property abutting the Mud River useful in determining the impaired market value of the landowners' properties.

In determining that the landowners' properties had a negative value, Snyder

---

5. Included among these are the properties owned by the appellants in Appeal No. 1997–CA–000210–MR.

6. "Fair market value" represents the price that a willing seller will take and a willing buyer will pay for property, neither being under any compulsion to sell or buy and both being in possession of all relevant information regarding the property. See *Central Kentucky Drying Co., Inc. v. Commonwealth, Dept. of Housing, Buildings and Construction*, Ky., 858 S.W.2d, 165, 167 (1993); and *Black's Law Dictionary* 537 (5th ed. 1973).

assumed that PCB-contaminated property that has not been remediated should not be used for growing crops, grazing cattle or for any other purpose, no matter what the level of PCBs present on the property. After conferring with experts in PCB contamination, Snyder calculated that even if Rockwell remediated the properties at issue, it would take as long as thirty years to do so. Until remediation is completed, there will be a loss of economic rent, that is, the landowners will be unable to safely use (or lease) their properties, or, at least, that portion of the properties that are not free from PCB contamination.

. . . .

As was said earlier, the landowners' claim for compensatory damages rests on Snyder's testimony. His empirical model, constructed for this case and untested in any other forum, finds no support in the literature. It has not been subjected to peer review other than in informal conversations Snyder had with two other Ohio appraisers. There is no scientific basis for the assumption upon which it rests——that any quantity of PCB contamination increases the risk of cancer in humans and may harm animals and/or crops. His unsupported opinion cannot form the basis for a damage award.[7]

As the Snyder testimony was the only evidence to support fair market value compensation, the Court of Appeals determined that the judgment should be reversed with directions to enter a directed verdict for Rockwell.

Appellants obtained review in this Court (CR 76.20) arguing that Snyder's testimony was properly admitted, and that even if it was not, there was ample evidence otherwise of harm to the properties to sustain the compensatory damages award. We now affirm in part and reverse in part.

The Court of Appeals decision with respect to admissibility of the Snyder testimony is unassailable. While it was rendered prior to our decision in *Goodyear Tire and Rubber Co. v. Thompson* and prior to the adoption of the view of the Supreme Court of the United States in *Kumho Tire Co. v. Carmichael*, it properly anticipated our position. The Court of Appeals followed *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, *Mitchell v. Commonwealth*[8] and *Fugate v. Commonwealth*[9] in all material respects. Accordingly, we affirm the Court of Appeals decision to exclude the expert testimony of Charles G. Snyder.

■ Despite our agreement with the Court of Appeals opinion pertaining to the Snyder testimony, we do not agree that the remedy is reversal for a directed verdict. Charles G. Snyder was not Appellants' only witness. Appellants presented evidence that PCBs were designated by Congress as hazardous in 1976 and that the EPA has determined that concentrations in excess of 50 parts per million presents an "unreasonable risk of injury to health within the United States."[10] There was evidence that under Kentucky law PCBs are classified as a "hazardous substance" and that the Kentucky Natural Resources and Environmental Protection Cabinet prevailed in litigation to require

7. *Rockwell International Corp. v. Wilhite,* No.1997–CA–000188–MR, slip op. at 19–24, 26–27 (Jan. 14, 2000).

8. Ky., 908 S.W.2d 100 (1995).

9. Ky., 993 S.W.2d 931 (1999).

10. *Rockwell International Corp. v. Wilhite,* No.1997–CA–000188–MR, slip op. at 11 (Jan. 14, 2000) (quoting 40 C.F.R. § 761.20).

Rockwell to remediate property subject to flooding along Town Branch. Evidence was presented that PCBs were present on the landowners' properties, that PCBs were dangerous and carcinogenic, that the properties should be tested and that the presence of PCB contamination affects the fair market value of real property and impairs its value as collateral.

The Court of Appeals acknowledged all of the foregoing evidence but concluded that without the Snyder testimony, the landowners had

> failed to prove [] that additional PCB exposure at low levels equals additional risk to themselves, their crops or their farm animals. The landowners must prove more than the presence of PCBs on their property; they must prove that the PCBs have somehow harmed their property. And the only way they can do so is by showing that PCBs in the quantities present on their properties are a health hazard.[11]

This Court recently confronted real property damages issues in *Ellison v. R & B Contracting, Inc.*[12] In that case, the landowners sought recovery against construction companies for trespass alleging the deposit of construction debris and the unauthorized storing and servicing of heavy equipment on their properties. The Court distinguished between permanent and temporary injury to real property. Permanent injury was defined as being when the cost of restoration exceeded the value of the property and temporary injury was when the property could be restored to its original state at a cost less than the market value. Our holding in *Ellison* was that evidence of cost of remov-

al in permanent injury cases created a reasonable inference as to the diminution of fair market value. This was argued to be a departure from *State Property & Buildings Commission v. H.W. Miller Construction Co.*[13] and *Newsome v. Billips*,[14] a fact squarely faced by the Court. Nevertheless, we held that a property owner can recover for diminution of the value of the real property based on evidence that waste material was illegally dumped and that the cost of removal exceeds the value of the property.

The Court of Appeals seems to have taken the position that Appellants' failure to present *competent* evidence of the total destruction of the real properties must result in a directed verdict for Rockwell. We disagree with this conclusion. In *Stewart v. Sizemore*,[15] it was determined on appeal that the trial court had admitted damage evidence improperly and the case was reversed. On the second trial, similar evidence was admitted and on appeal the second judgment was likewise reversed. The Court addressed the issue of the proper remedy where *incompetent* though not *insufficient* evidence is presented and whether the proper result is a directed verdict for the party opposing admission of evidence. We answered in the negative as follows:

> It is not a matter here of failure of proof, but of the improper admission of incompetent evidence. To follow the appellant's suggestion, and reverse the case with directions to reduce the judgment to $500, would be the equivalent of granting a directed verdict as to damages. And we are not aware of any precedent for holding that incompetent

11. *Rockwell International Corp. v. Wilhite*, No.1997–CA–000188–MR, slip op. at 24–25 (Jan. 14, 2000).

12. Ky., 32 S.W.3d 66 (2000).

13. Ky., 385 S.W.2d 211 (1964).

14. Ky.App., 671 S.W.2d 252 (1984).

15. Ky., 332 S.W.2d 281 (1960).

evidence, improperly admitted by the trial court, is the equivalent of no evidence at all, from the standpoint of the granting of a directed verdict for failure of proof. We believe the case must be reversed for another trial.[16]

Our recent decision in *Osborne v. Commonwealth*[17] contains a similar holding.

Finally, Appellant asserts that absent Joe Reid's grand jury testimony, there was insufficient competent evidence to convict him of these crimes and that to retry him would constitute double jeopardy. However, the issue is not whether Appellant would have been entitled to a directed verdict of acquittal absent the improperly admitted evidence, but whether the evidence that was, in fact, admitted was sufficient to take the case to the jury. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). We conclude that it was. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991). It is not our province to determine now whether the Commonwealth can produce competent evidence to avoid a directed verdict of acquittal upon retrial.[18]

In the case at bar, the Snyder testimony was not insufficient, it was inadmissible. As it was persuasive evidence supporting the verdict and final judgment, the Court of Appeals properly reversed and we affirm that portion of its decision. There was other evidence, however, of permanent injury to properties for which landowners may be entitled to compensation, and the proper remedy is remand to the trial court for a new trial in accordance with the views set forth herein.

Prior to a new trial, however, there are other issues that must be decided by the Court of Appeals. On appeal from the final judgment, Rockwell presented numerous issues, some of which asserted a right to prevail on all claims, while others asserted a right to prevail on the claims of particular landowners. As the Court of Appeals' decision rendered a ruling on those other issues unnecessary, our disposition requires remand to consider the issues raised by Rockwell but left unresolved by the Court of Appeals.

Accordingly, this cause is hereby remanded to the Court of Appeals for consideration of the issues presented by Rockwell but not decided in its opinion of January 14, 2000. In the event the Court of Appeals discovers no reversible error in other respects, the case shall be returned to the trial court for a new trial in conformity with this opinion and the subsequent opinion of the Court of Appeals, subject to the right of either party to move for discretionary review in this Court.

All concur, except STUMBO, J., who perceives no abuse of trial court discretion in its decision to admit the Snyder testimony.

---

16. *Id.* at 282.

17. Ky., 43 S.W.3d 234 (2001).

18. *Id.* at 245.