Jennifer L. SMITH, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–CA–000826–MR.

Court of Appeals of Kentucky.

Dec. 9, 2005.

---

9. 737 S.W.2d 184, 186 (Ky.App.1987).

10. *See Id.*

Scott C. Byrd, Louisville, KY, for appellant.

Gregory D. Stumbo, Attorney General, Louis F. Mathias, Jr., Assistant Attorney General, Frankfort, KY, for appellee.

Before COMBS, Chief Judge; HENRY and SCHRODER, Judges.

## OPINION

SCHRODER, Judge.

This is an appeal from a judgment in which a driver who was on methadone maintenance was convicted of second-degree manslaughter and second-degree assault stemming from a motor vehicle accident. Appellant argues that the trial court should have suppressed the results of her blood test and that the court erred in allowing expert testimony regarding the side effects of the two drugs found in appellant's blood. From our review of the record, the trial court properly denied the motion to suppress the results of appellant's blood test and properly allowed the experts to testify regarding the side effects of the drugs. Hence, we affirm.

On January 10, 2002, appellant, Jennifer Smith, left her home in Pineville at around 7:15 a.m. and drove to the DRD Knoxville Medical Clinic in Tennessee to receive her weekly supply of methadone. Smith had been taking this medication daily beginning in January 2001 as part of a methadone maintenance treatment program prescribed by her doctor to beat her six-year addiction to prescription drugs. Smith testified that she took 120 mg of methadone, which was her daily dose, at the clinic at 9:00 a.m. and then began her drive

home. On the way home, Smith stopped at the grocery store and at her daughter's cheerleading practice. At 12:00 p.m., Smith was driving north on U.S. 119 when her Chevrolet Tahoe crossed the double yellow line rounding a curve. In crossing over into the oncoming traffic, the Tahoe narrowly missed one car that swerved out of the way, side-swiped the rear quarter panel of another car, and then collided head-on with a Chevrolet Cavalier driven by Gary Dorton and occupied by twelve-year-old Robert Brock. Gary Dorton was pronounced dead at the hospital following the accident, and Brock was severely injured.

Two of the witnesses to the accident testified that they did not see a driver in the Tahoe when it crossed the double yellow line. One witness stated that he observed the driver of the Tahoe turn her steering wheel straight into the Cavalier before the impact. All the witnesses testified that the Tahoe came straight across into the oncoming traffic without ever attempting to brake or slow down. Police investigation of the accident revealed there were no skid marks left by the Tahoe.

Smith testified that just before the wreck as she entered the curve, she heard a clicking noise and felt a bump in the steering wheel. Smith maintained that, at that point, she was unable to steer the vehicle around the curve and crossed into the oncoming traffic. According to Smith, she had experienced this same problem with the vehicle a week before the accident and had her ex-husband drive the vehicle to see if he noticed anything unusual.

Following the collision, Smith was taken by ambulance to the Pineville Community Hospital. She was found to have a severe fracture of the right tibia and fibula. At 1:00 p.m., 1:35 p.m., and 2:35 p.m., she was administered 4 mg of morphine sulphate. At 1:25 p.m., she was administered 12.5 mg of promethazine, also known as Phenergan. At 2:25 p.m., she was administered a second 12.5 mg dose of promethazine. At 2:30 p.m., Smith was flown via helicopter to University of Tennessee Hospital at Knoxville.

While at Pineville Community Hospital, the police asked Smith if she would submit to blood and urine testing. Kentucky State Police ("KSP") Trooper Walter Cashen testified that Smith verbally agreed to the testing. He then read her the consent form which she signed while lying down. The blood was drawn at 1:50 p.m. (prior to Smith's second dose of promethazine) by a hospital medical technologist and was later transported to the Kentucky State Police crime lab for analysis. The results of the toxicology tests revealed that Smith had 2.3 mg% methadone in her urine and .068 mg% methadone in her blood. Additionally, she was shown to have .02 mg% promethazine in her urine and blood. The intake information obtained at Pineville Community Hospital indicated that Smith informed the hospital staff that she had taken methadone and Paxil that morning.

On April 9, 2003, Smith was indicted on one count of manslaughter in the second degree for causing the death of Gary Dorton, and one count of assault in the second degree for causing serious physical injury to Robert Brock. Prior to trial, Smith filed a motion in limine seeking to have the results of the toxicology tests suppressed on grounds that Smith was incapable of giving her consent to the testing because of her severe injuries. The court denied the motion because it was not properly filed as a motion to suppress under RCr 9.78. Thereafter, on March 2, 2004, Smith filed a motion to suppress the results of the toxicology tests pursuant to RCr 9.78, and a hearing was held on the motion on March 15, 2004. On March 22, 2004, the

court entered its order denying the motion to suppress.

On November 20, 2003, Smith filed another motion in limine seeking to prevent Dr. Gregory Davis, a pathologist and one of the Commonwealth's expert witnesses, from testifying at trial regarding Smith's methadone level and whether Smith should have been driving while taking methadone. A hearing was held on this motion on November 24, 2003, during which the trial judge indicated that he would likely let Dr. Davis testify about the side effects of methadone, but would not let him give an opinion on the ultimate issue in the case—whether Smith should have been driving with the amount of methadone in her system. However, the court stated that it would hold a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the day before or during the trial and would not conclusively rule on the issue until that time. Smith's counsel expressed concern more than once during this November 24, 2003 hearing that if Dr. Davis were permitted to testify about Smith's level of methadone, he would need to get an expert to testify about methadone maintenance and the fact that individuals on methadone maintenance were capable of driving.

The jury trial was held on March 23 and 24, 2004. The Commonwealth presented seventeen witnesses, including several eyewitnesses to the crash, the police officers and EMS workers who responded to the scene, two individuals from the KSP forensic laboratory, and Dr. Davis. During the trial, a *Daubert* hearing was held regarding the testimony of Dr. Gregory Davis. At the conclusion of the hearing, the court permitted Davis to testify: that the level of promethazine in Smith's blood was ten times higher than the 12.5 mg dose she received at the hospital prior to her blood test; about the risks and adverse effects of methadone and promethazine; to the general warnings given regarding these two drugs; about the dangers of combining these two drugs; and to the fact that methadone users will sometimes take promethazine to enhance the effect of methadone. Jane Purcell, one of the witnesses from the KSP forensic lab, was also permitted to testify regarding the side effects of methadone and promethazine. The Commonwealth's theory of the case was that on the day of the wreck, Smith took promethazine with her methadone, which caused her to pass out while driving and cross into oncoming traffic.

The defense presented the testimony of five witnesses, including Smith, but did not offer the testimony of any expert regarding methadone maintenance or to rebut the testimony of Dr. Davis or Purcell. Smith testified that she took one dose of methadone the morning of the wreck, that she experienced no side effects from it, and that she took no other drugs with the methadone.

The jury found Smith guilty of second-degree manslaughter and second-degree assault, and recommended a sentence of ten years' imprisonment on the manslaughter conviction and five years on the assault conviction, to be served consecutively. On April 20, 2004, the court sentenced Smith to a total of fifteen years in accordance with the jury's recommendations. Smith's appeal followed.

 We shall first address Smith's argument that the trial court erred when it denied Smith's motion to suppress the results of her blood tests. It has been held that the taking of a blood sample constitutes a search which implicates the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Warrantless searches are deemed unreasonable unless they fall within one of

the enumerated exceptions to the requirement that all searches must be performed pursuant to a warrant. *Cook v. Commonwealth*, 826 S.W.2d 329 (Ky.1992); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Consent is one of the exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Farmer v. Commonwealth*, 6 S.W.3d 144 (Ky.App.1999). The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant gave his voluntary consent to the search. *Farmer*, 6 S.W.3d at 146.

Smith's position at the suppression hearing was that she could not have consented to the blood test because of the extent of her injuries. Smith had a severe fracture of the right tibia and fibula. At the time her consent was obtained, she was immobilized and strapped to a spine board, and could barely raise her arm. The consent form reveals that she signed the form vertically instead of horizontally. Eleanor Lifert, one of the nurses from Pineville Community Hospital who attended Smith after the accident, testified at the hearing that Smith was alert and oriented at all times, including when her blood was drawn. KSP Trooper Walter Cashen testified that he read the entire consent form to Smith and she appeared to know what she was signing. He stated that he specifically asked her if she understood the form, and she replied that she did.

▇ In its order denying the motion to suppress, the court found, "that at the time the Defendant gave her consent to the blood sample request she was alert, oriented and in possession of her faculties and thus able to consent to the blood tests." A trial court's findings of fact on a suppression motion are deemed conclusive and will not be overturned so long as they are supported by substantial evidence.

RCr 9.78; *Diehl v. Commonwealth*, 673 S.W.2d 711 (Ky.1984). In *Diehl*, the testimony of police officers that the defendant's wife voluntarily gave her consent to search, coupled with the consent form signed by the wife, constituted substantial evidence to support the court's finding that voluntary consent was given. Similarly, in the present case, we believe the testimony of Lifert and Trooper Cashen, along with the consent form, was substantial evidence that Smith had the capacity to and did indeed give her consent to the blood tests.

▇ Smith's second argument is that the trial court erred in allowing Dr. Gregory Davis and Jane Purcell to testify to the effects of methadone and promethazine. Smith asserts that this testimony was unduly prejudicial, unreliable and failed to satisfy the requirements of *Daubert* in light of the generally accepted theory within the medical community that individuals on methadone maintenance function normally and do not experience the adverse side effects normally associated with the drug.

Pursuant to the court's ruling after the *Daubert* hearing in this case, Dr. Davis testified regarding the levels of methadone and promethazine in Smith's blood. Dr. Davis stated that Smith had ten times the level of promethazine in her blood that one would be expected to have with the 12.5 mg dose of promethazine administered to Smith at the hospital prior to her blood test. Davis also testified that methadone can cause sleepiness, blurred vision, and can render the user unable to perform complex tasks. As for promethazine, Dr. Davis testified that the drug can cause sedation, blurred vision, stumbling, and can likewise render the user unable to perform complex tasks. Davis further testified that the effect of combining methadone and promethazine would be to enhance the side effects of both drugs, and

that he was aware that methadone users will sometimes combine the two drugs to enhance the methadone's effect. According to Davis's testimony, the level of impact of the drugs will vary from individual to individual according to their tolerance level, but the risks and adverse effects of the drugs still exist for those on methadone maintenance. On cross-examination, Dr. Davis agreed that there are individuals who can function daily and perform complex tasks without impairment with certain levels of methadone or promethazine in their systems. Dr. Davis stated that the level of impairment depends on the tolerance level of the individual, the amount of the drug taken and the task at issue.

▮ Expert opinion testimony is admissible so long as: 1) the witness is qualified to render an opinion on the subject; 2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); 3) the subject matter satisfies the test of relevancy in KRE 401, subject to balancing probativeness against prejudice under KRE 403; and 4) the opinion will assist the trier of fact pursuant to KRE 702. *Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997), *cert. denied*, 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998). In assessing the reliability of expert opinion evidence under *Daubert*, the following factors may be considered by the court: 1) whether a theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) whether there is a high known or potential rate of error regarding the technique and whether there are standards controlling the technique's operation; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S.

at 592–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83; *accord, Mitchell v. Commonwealth*, 908 S.W.2d 100, 101–102 (Ky.1995), *overruled in part by Fugate v. Commonwealth*, 993 S.W.2d 931 (Ky.1999) (*Daubert* hearings no longer required for DNA evidence). On appeal, the standard of review is whether the trial court abused its discretion in deciding the admissibility of the expert opinion evidence. *Mitchell*, 908 S.W.2d at 102.

As for whether Dr. Davis was qualified to testify regarding the side effects of methadone and promethazine, the evidence established that Dr. Davis was a board-certified forensic pathologist who was currently employed as Associate Chief Medical Examiner for the State of Kentucky. Dr. Davis testified that he studied pharmacology and was specifically trained in toxicology analysis. In addition, Dr. Davis testified that he did a six-month fellowship (as part of his internship) in a drug and alcohol detoxification unit of a hospital, and has worked on many cases over the past seventeen years wherein people have been killed by toxic substances. We believe that Dr. Davis was eminently qualified to testify to the risks and adverse effects of methadone and promethazine in this case.

Relative to the *Daubert* analysis, Dr. Davis testified that he learned the known risks and side effects of all classes of drugs, including methadone and promethazine, from his pharmacology and toxicology classes in medical school. Smith complains that the trial court failed to analyze Dr. Davis's testimony under all the factors set out in *Daubert*, specifically, whether the theories regarding the drugs' effects were scientifically valid, whether the theories had been scientifically tested, and whether the theories had been subjected to peer review or publication. Our Supreme Court stated as follows with regard to application of the factors in *Daubert*:

We emphasize that the inquiry into reliability and relevance is a flexible one. The factors enumerated in *Daubert* and *Mitchell* are neither exhaustive nor exclusive. A trial court may apply any or all of these factors when determining the admissibility of any expert testimony.

*Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky.2000). The *Thompson* Court also recognized that in certain cases, the trial court may take judicial notice of reliability of the expert testimony if it has gained general acceptance within the relevant scientific community. *Id.* at 579; *see also Fugate*, 993 S.W.2d at 936–37; *Johnson v. Commonwealth*, 12 S.W.3d 258, 261–62 (Ky.1999). Although Dr. Davis did not specify what publications he was referencing or the specific studies that determined the drugs' side effects, we believe the known side effects of drugs have such widespread and general acceptance within the medical community that Dr. Davis's testimony was sufficiently reliable.

■ The next factor to be considered by the court is the relevance of the expert opinion testimony under KRE 401, subject to balancing probativeness against prejudice under KRE 403. Smith argues that the evidence that she was on methadone was prejudicial and outweighed its probativeness. We disagree. The Commonwealth's entire case was based on the fact that Smith was aware of and consciously disregarded the risk of driving while taking methadone and promethazine. KRS 507.040; KRS 508.010; KRS 501.020. Thus, the risks and adverse effects of the drugs were directly relevant to the determination of Smith's guilt. And the evidence of the risks and adverse effects of those drugs was not outweighed by any undue prejudice pursuant to KRE 403.

The last factor to be decided is if the expert opinion testimony will assist the trier of fact under KRE 702. Because the evidence of the risks and side effects of methadone and promethazine was critical to the determination of whether Smith was aware of and consciously disregarded these risks, and said evidence was outside the common knowledge of jurors, *see Stringer*, 956 S.W.2d at 889–90, it was properly admitted.

Smith's primary complaint relative to Dr. Davis's testimony was that it did not account for the generally accepted theory within the medical community that individuals on methadone maintenance function normally when taking methadone and do not experience the adverse side effects normally associated with the drug. First, although defense counsel recognized the need at the pre-trial hearing for its own expert witness to espouse this theory, no such expert was ever called by the defense. Secondly, the Commonwealth presented evidence that Smith took not only her daily dose of methadone on the morning of the wreck, but also took promethazine, even though she was aware of the risks of combining drugs. Finally, when asked by the defense on cross-examination if certain individuals could function daily and perform complex tasks without impairment while taking promethazine and methadone, Dr. Davis conceded that it was possible. Dr. Davis acknowledged that the level of impairment from drugs varies from person to person according to their tolerance level.

■ Smith also complains that the court erred in allowing the testimony of Jane Purcell, the KSP lab chemist who tested Smith's blood sample for the presence of drugs, to be admitted. Consistent with Dr. Davis's testimony, Purcell testified that both methadone and promethazine cause drowsiness and sleepiness. Ini-

tially, defense counsel stipulated to the experience and training of Purcell. However, when the prosecution began asking Purcell about the side effects of methadone and promethazine, defense counsel objected on grounds that Purcell was not qualified to testify to the side effects of drugs. A bench conference ensued which was not audible on the videotape of the trial. The court ultimately ruled that Purcell was qualified to testify to the effects of promethazine and methadone, but later adjudged that she could not testify about the drugs' effects on driving or the factors affecting the level of impairment on individuals.

■ Purcell testified that along with her education and training in chemistry and toxicology, she had attended conferences and workshops on different classes of drugs and how they affect driving. The

determination of whether an individual is qualified to render expert opinion testimony on a particular subject is within the sound discretion of the trial court. *Fugate v. Commonwealth*, 993 S.W.2d 931, 935 (Ky.1999). We do not believe the trial court abused its discretion in allowing Purcell to testify to the side effects of methadone and promethazine in this case.

For the reasons stated above, the judgment of the Bell Circuit Court is affirmed.

ALL CONCUR.