RENDERED: MARCH 18, 2010
TO BE PUBLISHED

**Supreme Court of Kentucky**

2008-SC-000787-MR

FINAL
DATE 6-17-10 Suságrant, D.C.

ESSAMOND WILBURN                                                          APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                          HONORABLE IRVIN G. MAZE, JUDGE
NOS. 07-CR-001511-001 & 07-CR-003438


COMMONWEALTH OF KENTUCKY                                          APPELLEE


**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING IN PART AND
REVERSING AND REMANDING IN PART**

Appellant, Essamond Wilburn, appeals from a judgment entered upon a jury verdict by the Jefferson Circuit Court convicting him of first-degree burglary, two counts of first-degree robbery, and of being a second-degree persistent felony offender. He was sentenced to a total of 20 years to serve. He now appeals his conviction as a matter of right pursuant to Ky. Const. § 110(2)(b), alleging that he was entitled to a directed verdict on the burglary and robbery charges and that the Commonwealth improperly used a peremptory strike against an African-American juror. For the reasons stated below, we affirm in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In the light most favorable to the verdict the facts are as follows. At about 12:30 a.m. on the morning of April 18, 2007, Wilburn and his brother, Terrance, attempted to rob Expressway Liquors located on Lee Street in Louisville, Kentucky. They used their father's 1989 Volvo as the getaway car.

That evening night manager Erik Bussman and employee Scott Reid were working at the liquor store. As they were beginning their closing procedures, Wilburn and Terrance entered the store with Wilburn in the lead carrying a .38 caliber revolver. Wilburn pointed the pistol at Reid and stated to the effect "we are here for the money; we know your buddy is back there."

Bussman was in the stock room performing his closing duties when the men arrived. Wilburn went toward the stock room, pointed the pistol at Bussman, and pulled the trigger; however, the gun did not fire. Bussman grabbed the store's .38 caliber revolver from the shelf next to the stock room door. He fired three shots, and the two robbers immediately fled the store and ran in different directions.

Police responders drove the area searching for the robbers. A short distance from the liquor store, on Floyd Street, a policeman apprehended Terrance. Not long afterward Terrance confessed to the attempted robbery and identified Wilburn as his accomplice. He also identified Wilburn as the gunman.

The next morning, Kenneth Singer, the owner of the liquor store, found a

.38 caliber revolver near the business. The gun was not loaded, which perhaps explains why it did not fire the night of the robbery. Meanwhile, a box containing .38 caliber bullets was found in the getaway car, which suggests that the Wilburn brothers may have simply forgotten to load the gun before the robbery attempt.

In July 2008, Wilburn was tried upon the charges of first-degree burglary, two counts of first-degree robbery, and as being a second-degree persistent felony offender. At trial, Terrance testified consistently with his confession, identifying Wilburn as his accomplice and as being the gunman. Various circumstantial evidence also implicated Wilburn. Wilburn's defense was a denial that he committed the crimes, and that Terrance was lying to gain favor in the prosecution against him.

At the conclusion of the trial Wilburn was convicted of all charges. He was sentenced to 15 years enhanced to 20 on each of the three charges. All sentences were ordered to run concurrently for a total of 20 years to serve. This appeal followed.

Wilburn presents three arguments: 1) that he was entitled to a directed verdict on the burglary charge; 2) that he was entitled to a directed verdict on the two robbery charges; and 3) that the Commonwealth improperly used a peremptory strike on an African-American juror.

## I. WILBURN WAS ENTITLED TO A DIRECTED

## VERDICT ON THE BURGLARY CHARGE

Wilburn contends that he is entitled to a directed verdict on the first-degree burglary charge because he did not enter or remain unlawfully on the premises of the liquor store. He argues that the liquor store is a public place that he was licensed to enter, and that he immediately fled following Bussman's gunshots, and so did not unlawfully remain once his license was revoked. We agree with Wilburn that the "enters or remains unlawfully" element of the burglary charge was not met, and, consequently, reverse the first-degree burglary conviction.

On a motion for a directed verdict, the trial judge must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky. 1991). The standard for appellate review of a denial of a motion for a directed verdict based on insufficient evidence is if, under the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, he is entitled to a directed verdict of acquittal. *Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky. 1983).

The first-degree burglary statute, KRS 511.020(1), provides as follows:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, *he knowingly enters or remains unlawfully in a building,* and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

4

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

(Emphasis added).

Also relevant to our review is the General Provisions statute of the burglary chapter, KRS 511.090. It provides, in relevant part, as follows:

(1) A person "enters or remains unlawfully" in or upon premises when he is not privileged or licensed to do so.

(2) A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license or privilege unless he defies a lawful order not to enter or remain personally communicated to him by the owner of such premises or other authorized person.

In the light most favorable to the Commonwealth, the relevant evidence presented at trial discloses the following: (1) at about 12:30 a.m. on the morning of April 18, 2008, the liquor store was open for business, including to the walk-in public; (2) Wilburn, with his brother following behind, entered the store armed with an unloaded .38 caliber revolver; (3) Wilburn demanded money and attempted to shoot Bussman with the empty gun; (4) Bussmann quickly grabbed the store's gun and fired it at Wilburn; (5) Wilburn and his brother fled as quickly as possible; and (6) when Wilburn and his brother entered the store they intended to rob it.

Under KRS 511.020(1), the "enters or remains unlawfully" element of first-degree burglary may be committed in one of two ways: (1) by entering the

building unlawfully; or (2) by remaining in the building unlawfully.

KRS 511.090(2) quickly disposes of the first possibility. The liquor store was open to the public. So even though Wilburn had the intent to rob the business when he entered, the statute provides that he nevertheless was licensed or privileged to be there upon his initial entry. It follows that Wiburn did not enter the premises unlawfully. KRS 511.090(2).

The question then becomes whether Wilburn "remained unlawfully" in the premises while at the same time maintaining his intent to commit a crime. Based upon the factual background as stated above, we must conclude that, as a matter of law, he did not.

Wilburn agrees that Bussman's firing of the gun at him was the functional equivalent of a personally communicated lawful order by an authorized person not to remain in the store, and that at that point Wilburn's license to remain in the store was revoked. KRS 511.090(2). However, at that juncture, Wilburn did not remain upon the premises; rather, he fled immediately. Based upon this fact, we must conclude that once his license to remain was revoked, Wilburn did not "remain unlawfully" upon the premises of the liquor store with the intent of committing a crime. It follows that his conviction must likewise fail under this provision of the first-degree burglary statute.

The Commonwealth's brief contains little countervailing analysis. It merely cites us to the cases *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky.

1997), and *Fugate v. Commonwealth*, 993 S.W.2d 931 (Ky. 1999). It then concludes "[a]s these cases make clear, Appellant's privilege to enter the liquor store terminated when he entered and remained for the purpose of committing robbery." The cited decisions, however, are distinguishable from the case at bar.

In *Bowling*, the defendant killed two victims in the course of a gas station robbery and then fled with money stolen from the business. *Bowling*, 942 S.W.2d at 307. Similarly, in *Fugate*, the defendant initially went to the victim's home for a social visit and was invited in. Subsequently, however, he shot the victim in the leg, and then twice in the head, killing him. He then "ransacked the victim's trailer looking for something to steal and tore the victim's wallet off its chain, taking the cash." *Fugate*, 993 S.W.2d at 940.

Thus, in *Bowling* and *Fugate*, the defendant killed the victim(s), thereby ending, by implication, his license and his lawful presence on the property, and then unlawfully remained to commit an additional crime. Those are not the facts in this case. Nor did Wilburn remain to commit crimes after Bussman terminated his license by firing the shots at him. Thus *Bowling* and *Fugate* are not analogous.[1]

Nor is the significant principle stated in the two cases relevant to the present case. *Bowling* states the principle as follows: "[i]mplicit in [KRS

---

[1] We note that *Tribbett v. Commonwealth*, 561 S.W.2d 662 (Ky. 1978), cited in both *Bowling* and *Fugate*, was the original decision in the line of cases. In *Tribbett* the defendant was initially invited into the home. He then killed his host and stole property from the residence.

7

511.090(2)] is the concept that license or privilege expires once the person commits an act inconsistent with the purposes of the business. Bowling terminated his license to be on the premises when he committed the criminal acts." *Id.* at 307. Similarly, the *Fugate* opinion states, "the privilege granted to one doing business ceases when the licensee commits acts, such as crimes, inconsistent with the business." *Id.* at 940.

The principle stated in the cases is sound; however, the Commonwealth's application of it to the facts of this case is not. For the principle to apply, the defendant must first perpetrate a crime (or other act) thereby bringing about, by obvious implication, the revocation of his license to remain in the dwelling or building. He must thereafter remain on the premises with the intention to commit a crime, which may be the completion of the robbery or any other crime. Only then are the elements of burglary satisfied under the principle.

As discussed, the Commonwealth failed to prove either that Wilburn unlawfully entered or unlawfully remained on the premises of the liquor store with the intent to commit a crime. He was entitled to a directed verdict on the charge. We accordingly reverse the trial court's judgment of conviction on the first-degree burglary charge, and remand the cause for entry of a judgment of acquittal.

## II. WILBURN WAS NOT ENTITLED TO A DIRECTED VERDICT OF ACQUITTAL ON THE FIRST-DEGREE ROBBERY CHARGES

Wilburn argues that he was entitled to a directed verdict on the two first-

8

degree robbery charges on the basis that the Commonwealth failed to prove the .38 caliber revolver he carried was operable, and, correspondingly, failed to prove that he was armed with a deadly weapon – an element necessary under the provision of the first-degree robbery statute Wilburn was charged with violating. We disagree.

As noted, the .38 caliber pistol Wilburn was armed with during the robbery attempt was not loaded, and so it did not fire when he aimed the gun at Bussman and pulled the trigger. Bullets fitting the gun were found in the getaway vehicle, but it is unclear from the record why the gun was not loaded – whether it was forgetfulness or a deliberate decision.

Further, the gun was not tested to see if it was capable of being fired when loaded. Nor, under present state of the law, is there any reason why such tests would be undertaken. *See Merritt v. Commonwealth*, 386 S.W.2d 727 (Ky. 1965) and *Kennedy v. Commonwealth*, 544 S.W.2d 219 (Ky. 1977) (holding that any object is a "deadly weapon" if used in a way that causes the victim to believe it is a deadly weapon, even, for example, a toy gun).

As reflected in several recent unpublished decisions, this Court has recognized that our cases fail to comport with the plain language of the currently enacted robbery statutes, and that the principles stated in the cases have received criticism from eminent scholars and our intermediate court.[2]

---

[2] *See Moore v. Commonwealth*, 2008 WL 3890168 (Ky. Aug. 21, 2008); *Fegley v. Commonwealth*, 2008 WL 466150 (Ky. Feb. 21, 2008); and *McIntosh v. Commonwealth*, 2008 WL 2167894 (Ky. May 22, 2008). The result we reach would be the same under *Merritt* and *Kennedy*.

We view this as the appropriate opportunity to re-assess the viability of the

*Merritt* and *Kennedy* holding in the light of the statutory framework provided by

the penal code, mindful that the legislature may elect to consider the

disconnect between the case holdings and the language of the statutes

involved, and take whatever action it considers appropriate.[3]

KRS 515.020 provides as follows:

(1) A person is guilty of robbery in the first degree when, in the
course of committing theft, he uses or threatens the immediate use
of physical force upon another person with intent to accomplish
the theft and when he:

(a) Causes physical injury to any person who is not a
participant in the crime; or

(b) Is armed with a deadly weapon; or

(c) Uses or threatens the immediate use of a dangerous
instrument upon any person who is not a participant in the
crime.

KRS 500.080(4)(b) defines a deadly weapon, as relevant here, as follows:

"Any weapon from which a shot, readily capable of producing death or other

serious physical injury, may be discharged[.]"

It is difficult, if not impossible, to reconcile the language of the foregoing

statutes with the *Merritt/Kennedy* concept that the operability of a gun is

immaterial because *any object* is a deadly weapon if used so as to cause the

---

[3] We are cognizant that "if the legislature reenacts the statute without rejecting the interpretations of the earlier act, it probably means to approve those interpretations." *Cosby v. Commonwealth*, 147 S.W.3d 56, 62 (Ky. 2004). Legislation following *Merritt* has not specifically rejected the conception of a "dangerous weapon" as enunciated in the decision.

victim to believe it is a deadly weapon. An object which cannot "discharge" such a shot, cannot be a "deadly weapon" under KRS 500.080(4)(b),[4] or so it would seem.

*Merritt* is the pre-penal code source of the concept we now examine. *Merritt* was a robbery case, based on the predecessor of KRS 515.020, KRS 433.140, which enhanced the sentence for a robbery or burglary committed by anyone who "uses or displays any pistol, gun, other firearm or deadly weapon" in the commission of the offense. The statutes then did not define "pistol, gun, other firearm or deadly weapon." Expressing disdain for the prosecution's argument that a non-operable toy gun is actually a kind of "gun", the Court with no citation of authority or further explanation, simply declared that "within the context of this statute (KRS 433.140) any object that is intended by its user to convince the victim that it is a pistol or other deadly weapon and does so convince him is one." *386 S.W.2d at* 729. *Kennedy* was the first case to address the issue after the repeal of KRS 433.140 and the enactment of KRS 515.020 and KRS 500.080(4)(b). In *Kennedy,* this Court reconciled the *Merritt* decision and the seemingly contradictory language of KRS 500.080(4)(b) by referring to the unofficial notes and commentary that accompanied the adoption of the current statutes. That commentary, in part, stated:

> In describing what constitutes a 'deadly weapon,' the Court of Appeals recently ruled that any object can be a deadly weapon if intended by its user to convince a victim that it is deadly and if the victim is in fact convinced. *Merritt v. Commonwealth,* 386 S.W.2d

---

[4] KRS 500.080(4) (a), (c), (d), (e), (f), (g), and (h) define other forms of deadly weapons, i.e. knives, clubs, etc.

727 (Ky.1965). In that case, the defendant was convicted of armed robbery despite the fact that the 'weapon' he used may have been a toy pistol. *There is no intention to change this decision through the provisions of this chapter.*

*Kennedy,* 544 S.W.2d at 222 (Emphasis added).

In *Kennedy,* the Court did not otherwise explain how the *Merritt* holding fit within the language actually used in the new statutes. It did not explain how a toy gun or finger in the pocket can be "any weapon," per KRS 500.080(4)(b), much less a "deadly" one. Its binding of the *Merritt* holding to the current statutes has been often repeated, but never re-examined.

*Kennedy* was soon followed by *Helpenstine v. Commonwealth,* 566 S.W.2d 415, 416 (Ky. 1978), which approvingly cited *Merritt* in holding that "any object" could be a deadly weapon, and stated again that the operability of the handgun used in the robbery is "not relevant."

Notwithstanding the commentary referenced in *Kennedy,* there is no way, with proper deference to the English language, that the words used in KRS 515.020 and KRS 500.080(4)(b) can be construed to support the conclusion reached by this Court in *Kennedy* and repeated in *Helpenstine.* No amount of intent or intimidation by a robber can turn a toy gun, or a stick, or a finger in the pocket into a "weapon, from which a shot, readily capable of producing death or serious physical injury, may be discharged." Nor, can any subjective belief in the mind of the victim turn a toy into a deadly weapon. In *Kennedy,* we disregarded the express language of the statutes adopted by the legislature,

12

relying instead on unofficial commentary and notes. In so doing, we breached a fundamental rule of statutory construction that we ascertain the intention of the legislature from words used in the statutes rather than surmising what may have been intended but was not expressed. *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005). We should resort to a review of legislative intent or legislative history only when the language of the statute is not clear. *Mitchell v. Chapman*, 343 F.3d 811, 826 (6th Cir. 2003). In *Kennedy*, this Court extrapolated the *Merritt* holding into the current statute by erroneously allowing the commentary to supersede the clearly contrary language of the statute.

We find nothing in the language of the statutes now in effect that would support *Kennedy's* adoption of the *Merritt* rule that "any object" intended by its user to convince the victim that it is a pistol or other deadly weapon, and does so convince him, is one. We therefore overrule *Merritt* as being inapplicable to the statutes now in effect. To the extent that they apply *Merritt* over the statutes currently defining robbery committed with the use of a deadly weapon, *Kennedy* and *Helpenstine* are overruled. But, while we reject the rationale used in *Kennedy* and *Helpenstine* to support the holding that the operability of a firearm used in a robbery is immaterial, we do not necessarily adopt the opposite conclusion that operability of the weapon is an essential element of proof in an armed robbery case. Accordingly, we take a fresh look at the issue to determine the meaning of "armed with a deadly weapon" under KRS

13

515.020(b), with appropriate respect for the words used in KRS 500.080(4)(b) to define specific sorts of deadly weapons.

Wilburn was charged under KRS 515.020(1)(b), and so the .38 caliber pistol he was carrying must have been a "deadly weapon" for that element of the crime to be satisfied. KRS 500.080(4)(b) defines a deadly weapon, as relevant here, as follows: "Any weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged[.]"

If the literal language of a statute is clear and unambiguous, it must be given effect as written. *Bailey v. Commonwealth,* 70 S.W.3d 414, 416 (Ky. 2002). While the remainder of the statute is plain and unambiguous, we believe the first two words of the definition – "any weapon" – is subject to alternative interpretations. More specifically, we believe the phrase is subject to interpretation meaning either: (1) only the specific "weapon", or object, used in the particular crime; or (2) the class of weapons to which the specific weapon belongs. For example, in the present case, the language may be interpreted to refer to either the specific pistol carried by Wilburn, or to a class of items that includes pistols in general.

If the phrase refers to the class consisting of all pistols generally, then the answer is self-evident. A shot discharged from a pistol may readily produce death (or serious physical injury), and it makes no difference whether the particular pistol is not loaded, or has a missing firing pin, or a clogged barrel, or any other particular defect which would prevent it from firing a shot. A

14

pistol is among the sort of things, the class of items, from which death or an injury-causing shot may be discharged. If, however, the phrase refers to a particular pistol, then whether the pistol is empty or otherwise inoperable is critical to determining if it meets the definition of a deadly weapon. An unloaded pistol or a pistol without a firing pin, when considered individually, is not one from which a shot may be discharged.

The statute being ambiguous, we next look to legislative intent. *Dep't of Motor Transp. v. City Bus Co.,* 252 S.W.2d 46, 47 (Ky. 1952) ("When a statute is ambiguous and its meaning uncertain, the legislative intent should be determined by considering the whole statute and the purpose to be accomplished"). We refrain from interpreting a statute so as to produce an absurd or unreasonable result. *Kentucky Unemployment Ins. Com'n v. Jones,* 809 S.W.2d 715, 716 (Ky. App. 1991) ("The courts have a duty to accord statutory language its literal meaning unless to do so would lead to an absurd or wholly unreasonable result.").

Applying the foregoing principles, we have no difficulty in concluding that the legislature's use of the term "any weapon" was intended to apply to the class of weapons as a whole, and not an individual weapon falling within the class. In other words, again using the present case as an example, the legislature must have intended to refer to pistols in general, and not the individual .38 caliber revolver that Wilburn was carrying the night of the hold-up.

Interpreting the phrase to refer to an individual weapon would produce an absurd and unreasonable result. After all, as a general common-sense rule, the robber seeks only to intimidate the victim into relinquishing his property and avoid actual use of the weapon – he wants to rob, not rob and murder.[5] Interpreting the language to refer to the individual weapon would create a loophole allowing robbers to gain the decidedly advantageous benefit of pointing an actual pistol at the victim, but allowing him to escape the consequences of the deadly weapon enhancement to first-degree robbery[6] by, for example, simply removing the firing pin or emptying the chamber. In view of this, the legislature could not have intended the phrase "any weapon" to refer to an individual weapon. That, quite simply, is an unreasonable interpretation. The legislation is intended to deter and punish first-degree armed robbery, not coach a robber on how to avoid the charge.

In summary, we construe KRS 500.080(4)(b)'s definition of "deadly weapon" as a reference generally to the class of weapons which may discharge a shot that is readily capable of producing death or serious physical injury. A .38 caliber revolver, operable or not, falls into that class of weapons. A toy gun or a water pistol does not. Therefore, Wilburn was armed with a deadly weapon within the meaning of 515.020(1)(b), and he was not entitled to a

---

[5] We recognize that, of course, a robber will sometimes want to use the weapon in order to eliminate a witness.

[6] As relevant here, robbery without a deadly weapon would be second-degree robbery, a Class C felony. KRS 515.030. First-degree robbery is a Class B felony. KRS 515.020.

directed verdict upon the grounds that the Commonwealth failed to prove his firearm met the statutory definition of a deadly weapon.

We recognize that this construction of KRS 500.080(4) will, in other circumstances, yield a result different from that attained by the *Merritt/Kennedy* rationale. But, it is the only construction that fairly respects the language of the statute, language which we no longer feel constrained to ignore.

We reject the analysis expressed in Justice Noble's dissenting opinion requiring proof that the firearm was operable at the time of the robbery. In many, if not most, armed robbery cases, the gun is not immediately recovered, and therefore, proof of its operability would be impossible to establish. We do not believe the General Assembly intended to impose such an insurmountable burden on the state's ability to sustain its burden in robbery cases. We also note, in response to that opinion that many items used in a robbery that do not meet the definition of "deadly weapon" under KRS 500.080(4), as we interpret it herein, would easily qualify as a "dangerous instrument" under KRS 500.080(3).

We do not foresee any substantial difficulty in the practical application of our interpretation of the law, for example, in circumstances where the alleged "weapon" is never recovered and its authenticity cannot be readily established. Obviously, an unseen, unknown item as in *Merritt,* or an item which the witnesses clearly recognize as a toy, will not qualify as a "deadly weapon" under

17

our statute. In other instances, we do not anticipate that presenting sufficient proof that the object was a deadly weapon will impose an unrealistic burden upon the prosecution. The victim's description of the item would ordinarily provide sufficient evidence to permit the jury to decide whether it was among the sort of items declared by the legislature to be a "deadly weapon."

## III. NO BATSON VIOLATION OCCURRED

Wilburn contends that a violation of *Batson v. Kentucky,* 476 U.S. 79 (1986), occurred on the basis that the Commonwealth used a peremptory strike to remove African-American Juror 215604 from the venire.[7] The Commonwealth's proffered reason for removing the juror was that she expressed that she believed a former friend had been unfairly prosecuted and that he did not deserve the sentence he received. Wilburn argues that Juror 171652 was similarly situated to the stricken juror.

Juror 171652 had a brother who had been prosecuted on drug and domestic violence charges; however, the juror stated that she believed he had been treated fairly. Juror 171652 also stated that she did not believe police acted appropriately when investigating her reports of six car break-ins.

Wilburn asserts that the Commonwealth's use of a peremptory strike to remove Juror 215604 while not objecting to Juror 171652 demonstrates that the removal of the African-American was motivated by race.

---

[7] Wilburn is African-American.

In *Batson, supra,* the United States Supreme Court prohibited deliberate racial discrimination during jury selection. Under *Batson,* we recently explained,

> [a] three-prong inquiry aids in determining whether a prosecutor's use of peremptory strikes violated the equal protection clause. Initially, discrimination may be inferred from the totality of the relevant facts associated with a prosecutor's conduct during a defendant's trial. The second prong requires a prosecutor to offer a neutral explanation for challenging those jurors in the protected class. Finally, the trial court must assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply pretextual for discrimination against the targeted class.

*McPherson v. Commonwealth,* 171 S.W.3d 1, 3 (Ky. 2005) (citations and footnotes omitted).

The trial court's ultimate decision on a *Batson* challenge "is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth,* 241 S.W.3d 799, 804 (Ky. 2007) (citation omitted). "Deference," of course, does not mean that the appellate court is powerless to provide independent review, *Miller-El v. Dretke,* 545 U.S. 231, (2005) (holding that the trial court's finding of non-discrimination was erroneous in light of clear and convincing evidence to the contrary), *Snyder v. Louisiana,* ___ U.S. ___, 128 S.Ct. 1203, (2008) (same), but the ultimate burden of showing unlawful discrimination rests with the challenger. *Chatman, supra.; Rodgers v. Commonwealth,* 285 S.W.3d 740, 757-758 (Ky. 2009).

Juror 215604, the African-American juror, stated during the

Commonwealth's voir dire that she had a friend who had gotten mixed up in some trouble with several others and that, following a trial, was currently serving time in the penitentiary. The juror stated although she had neither gone to court nor maintained contact with him, she knew his character, she believed he was prosecuted unfairly, and she believed that he did not deserve the sentence he received. During defense counsel's voir dire, Juror 215604 stated that her friend's experience, which happened in 2002, would not have an effect on her ability to impartially weigh the evidence.

Juror 171652, the Caucasian juror, stated during the Commonwealth's voir dire that she had a brother who had pleaded guilty to the minimum sentences on several drug possession and domestic violence charges. She went on to say, however, that he and his family were treated fairly by the police and prosecutors. Nevertheless, she was critical of the police's conduct in connection with a series of car break-ins. The juror stated that she did not think the police acted appropriately investigating her reports of six car break-ins during a six month period, all occurring in her driveway. She believed it was especially inappropriate when they told her that she should leave her car unlocked to avoid having the windows broken. Ultimately, she indicated that her experience with the break-ins would have no effect on her view of police witnesses.

The Commonwealth's race-neutral basis for striking Juror 215604 was that the juror had stated that her friend had been wrongly arrested, wrongly

convicted, and received an unfair sentence. And although she had indicated she could be fair, the Commonwealth argued that "because of that experience with someone very close to her we don't think she's qualified to be a good juror . . . a qualified juror for the Commonwealth." Ultimately, the trial court ruled that the Commonwealth's strike was for a race-neutral reason given its reasonable concern that the juror would continue to have concerns as noted, potentially causing her to, in effect, "lock-up" at some point in making a decision.

Considering the deference we must give to the trial court, we are unpersuaded that the Commonwealth's different treatment of Juror 171652 and Juror 215604 establishes that the strike was for a race-based reason. There are several degrees of difference between the two experiences related by the two jurors and the potential to evoke bias against the Commonwealth. Juror 215604 related an experience in which, she believes, an innocent man was incarcerated because of unfair treatment by police and prosecutors. On the other hand, Juror 171652 had an experience involving her brother in which he and his family were treated fairly. Moreover, the experience with the car break-ins describes more of an experience with police incompetence as opposed to outright misconduct against an innocent person. Thus, the two jurors are not similarly situated at all in their respective experiences with the police and prosecutors. The risk of bias against the Commonwealth is substantially different between the two cases. In light of the deference with which we review

21

the trial court's *Batson* rulings, we are constrained to conclude that the trial court did not abuse its discretion when it found that the Commonwealth's proffered race-neutral reason for striking Juror 117985 was not a pretext for discrimination.

## CONCLUSION

For the foregoing reasons the judgment of the Jefferson Circuit Court is affirmed in part, reversed in part, and the cause is remanded for additional proceedings consistent with this opinion.

All sitting. Abramson and Cunningham, JJ., concur. Schroder, J., concurs in result only by separate opinion, in which Scott, J., joins. Noble, J., dissents by separate opinion in which Minton, C.J., joins.

SCHRODER, J., CONCURRING IN RESULT ONLY: I don't agree with overruling *Merritt, Kennedy, and Helpenstine.* The majority's new analysis would preclude a conviction for first-degree robbery if the defendant used an exact toy replica of a handgun, which would produce the same reaction in the victim – terror and surrender of the property. I believe such an interpretation would lead to an absurd result not intended by the Legislature.

Scott, J., joins.

NOBLE, J., DISSENTING: With all due respect, I dissent.

After an extremely well-written rejection of this Court's cases that ignore the plain language of the statute the majority goes ahead and does it again.

To be convicted of first-degree robbery, at least under the circumstances

22

presented in this case, Appellant had to have been armed with a deadly weapon. See KRS 515.020(1)(b). KRS 500.080(4)(b) defines a deadly weapon, as it is used in the robbery statute, as "[a]ny weapon from which a shot, readily capable of producing death or serious physical injury, may be discharged." As the majority notes, "No amount of intent or intimidation by a robber can turn a toy gun, or a stick, or a finger in the pocket" into such a weapon, and our previous cases, including *Meritt v. Commonwealth*, 386 S.W.2d 727 (Ky. 1965), *Kennedy v. Commonwealth*, 544 S.W.2d 219 (Ky. 1976), and others, clearly disregarded the plain language of the statute in so holding.

But I can't read any ambiguity in the words "any weapon," nor can I find anything in the statute that talks about a "class" of weapons, either, as the majority seems able to do. The logic, or syllogism, applied by the majority, in its simplest terms, is as follows:

1. Pistols are deadly weapons because a pistol can fire a shot.

2. The weapon used in this case was a pistol.

3. Therefore, it must be a deadly weapon.

The gaping hole in this logic is that it cannot be said that the gun in this case *could fire a shot,* deadly or otherwise.

In defining "deadly weapon," the legislature drafted four clear elements. It is (1) *any* weapon (2) from which a *shot* (3) may be *fired,* (4) and the shot is *readily capable* of producing death or serious physical injury. To define an object as a deadly weapon, all four elements must be present.

23

First, *any* may mean "one out of many," or "some," "many," "either," "every," or "all." *Black's Law Dictionary* 94 (6th ed. 1990). That definition is admittedly somewhat ambiguous. However, as the *Black's* definition explains, the word *any* is given meaning in a given statute by the context and subject matter of the statute. Here, it modifies the singular *weapon* in the clear context of that weapon being used to *fire* a *shot*. It is the shot that must be *readily capable* of producing death or serious bodily injury. Thus a weapon, in order to be statutorily deadly, could not fire paint balls or marshmallows, because the *shot* would not be *readily capable* of the requisite injury. By the same token, a weapon that could not *fire* a shot cannot be a deadly weapon. No one word in the statute has any more importance in meaning than the others.

Second, to suggest that a "*class* of weapons" should be substituted for the term *any* weapon is to write a term into the statute that is not there. This adds the meaning to the statute that weapons must first be categorized into a "class" (whatever its parameters may be), and that the entire *class* must be capable of firing a shot. A *class* is not a weapon, but is rather a category into which weapons are separated, and is not capable of firing anything. The weapons in the class may or may not be capable of firing a shot at any given point in time, which brings us back to the actual language of the statute: any *weapon from which a shot may be discharged.*

*Weapon,* as pointed out above, is a singular term in the context of the

statute. The plain meaning of the statute refers to one weapon, presumably the one in question, being capable of firing a shot. If this Court is going to disturb longstanding precedent (and how can we not given we have clearly invaded the legislative province), then we should read the statute literally instead of arriving at the same result of the previous cases, only by a different route.

The majority states that the phrase "any weapon" can mean one of two things: the specific weapon used in the crime or a class of weapons to which the specific weapon belongs. The majority concludes that the statute must mean the latter, i.e., a "class of weapons," and specifically that it refers to "the class consisting of all pistols generally," because a pistol "is among the sort of things, the class of items, from which death or an injury-causing shot may be discharged."

Yet, defining an abstract "class" is what every statute does, without reference to specific acts, results, or objects. That abstract class must then be applied to an individual factual scenario to see what the legal conclusion is, i.e., whether the act, result, or object falls within the defined class. For example, KRS Chapter 507 defines various forms of illegal homicide, including murder, which are punished at different levels depending on the circumstances and characteristics of the homicide. That the classes are defined legally, however, does not mean that a given homicide can be placed into whichever category it seems to fit best as matter of law. The placement of the homicide

into one of those classes is a question of fact—whether it is a murder, a manslaughter, a negligent homicide, or a legally justified killing—that can only be made by a jury. Indeed, whether a given death is even a homicide—that is, a person causing the death of another person—requires the application of an abstract class to the facts in question.

Similarly, whether a given weapon, or even a pistol, meets the statutory definition of a deadly weapon requires application of the law—namely, the definition laid out in KRS 500.080(4)(b)—to the facts. In this case, those facts include that Appellant was carrying an object, commonly known as a pistol, which, while operable, was not loaded at the time of the alleged crime. While it is likely that in most instances, the pistol in question will meet the definition in the statute, no amount of inductive logic can make it true for all pistols.

The majority's own attempt at making distinctions under this definition demonstrates the problem with its approach. The majority concludes,

> In summary, we construe KRS 500.080(4)(b)'s definition of 'deadly weapon' as a reference generally to the class of weapons which may discharge a shot that is readily capable of producing death or serious physical injury. A .38 caliber revolver, operable or not, falls into that class of weapons. A toy gun or a water pistol does not.

Yet, if the phrase "any weapon" includes pistols, then it includes toy pistols and water pistols. The reason the majority would read them out of the "class" of weapons is because no deadly shot can be discharged from them. This, of course, requires an application of the definition to the facts, a determination

26

that the facts (a benign toy gun) do not match the legal class (weapons from which a dangerous shot may be discharged). This return to the definition, rather than reliance on an abstract category, is inevitable, and is in fact reflected in the majority's own language laying out the covered "class" of weapons, which inevitably dips back in the "deadly weapon" definition to add qualifying language. The majority bypasses this process, placing objects into categories without reference to the qualities and characteristics that define those categories.

This discussion has been admittedly abstract, so perhaps a concrete example will prove fruitful. Imagine a plastic water pistol loaded with a strong acid such as hydrofluoric acid. A single shot from such a toy could easily maim or cause death. Surely such a weapon would satisfy the definition of a deadly weapon, as it is a "weapon from which a shot, readily capable of producing death or serious physical injury, may be discharged." Yet, under the majority's approach, such a water pistol, regardless of its chemical circumstances, is not a deadly weapon.

The majority's approach is an example of *begging the question*, as in the logical fallacy whereby one assumes the point at issue. "The fallacy of begging the question consists in taking for granted precisely what is in dispute, in passing off as an argument what is really no more than an assertion of your position." Jamie Whyte, *Crimes Against Logic* 108 (2005); *see also* James Welton et al., *Intermediate Logic* 256 (4th ed. 1962) (stating the error

27

"is…committed when a proposition which requires proof is assumed without proof"). The majority, rather than applying the law to the facts (or better yet, allowing a jury to do so), simply assumes that the facts fall within the law and that because the gun in this case was a pistol it must have been a deadly weapon.

Essentially, the majority concludes that all pistols are deadly weapons because pistols are generally capable of discharging deadly shots. But whether the item is capable of discharging such a shot is exactly the thing that must be proved. All the majority has done is replace the statutory class with another class ("pistols"), which has the effect of judicially amending the statute. Nor does this replacement truly solve the problem, since it leaves open the question of whether a given object is a pistol.

In fact, the way the majority reads the statute, that "any weapon" can refer to a class of items including all pistols, effectively makes the remainder of the definition in KRS 500.080(4)(b) surplusage. Going so far as to state that "[i]f the phrase ['any weapon'] refers to a class consisting of all pistols generally, then the answer is self-evident," in no small part because a "shot discharged from a pistol may readily produce death (or serious physical injury)," the majority renders unnecessary the language in KRS 500.080(4)(b) that qualifies the language "any weapon" (and further defines "deadly weapon").

The majority's approach is akin to saying that the definition of "car" includes all four-door sedans, as a matter of law, because they have four

28

wheels and a motor, even where the sedan in question has no wheels and the legal definition of "car" requires that the vehicle have "a motor and four wheels." Simply because common sense tells you that the sedan is still a car, even without wheels, cannot trump the legal definition of "car," which requires the presence of wheels. So too, the intuition that a pistol is a deadly weapon cannot trump the legal requirement that an object be able to discharge a deadly shot to be a deadly weapon. Had the legislature wanted to simply include all pistols, without additional characteristics (such as the ability to discharge a shot), it could have listed pistols under the definition of deadly weapons. The legislature chose to do this with other classes of weapons, such as "blackjack" and "nightstick," included under the definition of deadly weapon. *See* KRS 500.080(4)(a), (c) – (h). But even these classes require an application of the law to the facts to decide whether a given object is a "blackjack" or "nightstick" or other class of weapon.

The majority opinion creates a curious disconnect. It argues that the definition in KRS 500.080(4)(b) is abstract, referring only to a class, which obviates the need to consider whether any given weapon meets the definition. But the robbery statute in question requires that a defendant be "armed with a deadly weapon." KRS 515.020. Substituting the majority's definition of "deadly weapon" would require that a defendant be "armed with a class of weapons" to be convicted. But that would be a ridiculous notion, as defendant can only be armed with a concrete, individual weapon (or weapons), not an abstraction like

29

a "class." Reference and application to the specific, the concrete—what the defendant was actually armed with—is inescapable.

The following question must always be asked: does the actual object meet all elements of the statutory definition? That clearly is not the case with a gun that has been rendered inoperable because its barrel has been plugged or the firing mechanism has been broken. The question is closer where the gun is not loaded but is otherwise operable.

The argument has been made that a literal interpretation of the statute would allow criminal defendants to outsmart the justice system by removing the firing pin from a gun after a robbery and thus avoid a robbery first conviction. This is not a problem with the law; it is problem of proof. Many crimes are difficult to prove, in part because criminals tamper with evidence after the fact.

I am not troubled by this, because any conviction should stand on the evidence alone, not on what the evidence might be or on factual assumptions read into the law. Also, the more severe penalty for first-degree robbery could not be avoided if the gun was actually fired, and citizens were actually exposed to the potential harm of a deadly weapon. If no one is actually injured, then the penalty for second-degree robbery suffices if first-degree robbery cannot be proven. It is not as if the defendant would get an acquittal.

This argument is similar to the facts of this case. An actual hand gun was used, but it was not loaded. There is a certain outrage that the Appellant

would use a gun, loaded or not, because it is certainly extremely frightening to the victim to even see a gun during a robbery. But I agree with the majority that it is not the perspective of the victim that is covered by the language of the statute. The fact is the gun could not, and did not, fire. We actually don't know if it could have fired if loaded, because it was not tested. This is a failure of proof, or case preparation, not of statutory meaning. However, even if Appellant could not have been convicted of first-degree robbery under the plain language of the statute, he could have been convicted of second-degree robbery, which is all the proof established.

There is also the argument that reading the statute literally would make a conviction more difficult when the weapon could not be found. This is simply a problem under any test. Certainly, when a weapon is missing at trial, the jury can only rely on the testimony of witnesses. If a witness testifies that a shot was actually fired, then there is no great difficulty in getting a first-degree robbery conviction if the jury believes the witness. But if a witness merely describes a hand gun, for example, how does the jury know if it was really a gun or just an Air Soft replica, which is made exactly to scale and that is so popular with youngsters today? The majority says it does not intend to include toy guns in its "class" test, but how can the difference be told? If the fear is that a conviction cannot be obtained when there is no weapon at trial, the majority opinion does not eliminate that fear, since it correctly does away with the subjective perspective of the victim.

I simply cannot understand why this Court feels so compelled to save a first-degree robbery conviction when the evidence does not support it. If all the evidence supports is a second-degree robbery conviction, then there is no real justice in making a first-degree robbery conviction out of speculation. What is the Court really trying to accomplish, and more importantly, why is it doing this? It is not our duty to rewrite the statute, but rather to interpret it as it is written.

I would reverse on the Robbery charges and remand for a new trial.

Minton, C.J., joins.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender

Cicely Jaracz Lambert
Assistant Appellante Defender

Charles Hall Stopher
Assistant Public Defender
Advocacy Plaza
717-719 West Jefferson Street
Louisville, KY 40202

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Stephen Bryant Humphress
Assistant Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204