Laura Beth **BROOKS**, Appellant

v.

Hugh Junior **BYRD**, II, Appellee

NO. 2015–CA–000464–ME

Court of Appeals of Kentucky.

RENDERED: APRIL 15, 2016; 10:00 A.M.

BRIEF FOR APPELLANT: Braxton Crenshaw, Lexington, Kentucky

BRIEF FOR APPELLEE: Corey Allison Lee, Richmond, Kentucky

BEFORE: NICKELL, STUMBO, AND VANMETER, JUDGES.

## OPINION AND ORDER

NICKELL, JUDGE:

Laura Beth Brooks, the biological mother of two girls—one born in 2002 and the other in 2009—appeals the Madison Circuit Court's award of sole custody to Hugh Junior Byrd, II, the girls' biological father. Brooks alleges the trial court's award lacked evidentiary support, failed to discuss statutory factors governing custody, and in denying Brooks' request for joint custody, constituted an abuse of discretion. Upon review of the record, the briefs and the law, we dismiss the appeal due to noncompliance with CR 73.02(1)(e).

## FACTS

To put this case into context, Brooks and Byrd met in Florida in February 2002. Though they never married, they lived together for thirteen years—much of it in Berea, Kentucky—where their two daughters have spent most of their lives. Brooks' relationship with Byrd soured. They separated in June 2014, but made no decision about where the girls would live.

A month later, in July 2014, Brooks went to Florida, ostensibly to care for her ailing grandfather who was receiving dialysis and had no local caregiver. In reality, she took the girls with her to Winter Haven, Florida, and all three moved in with Gary Melton—an ex-boyfriend with a criminal record whom the girls had never met.

On August 4, 2014, Byrd traveled to Florida to visit his daughters—a visit Brooks welcomed. Upon learning Brooks and his minor daughters were living with Melton, Byrd brought the girls back to Berea and on August 22, 2014, petitioned for sole custody and child support. Brooks filed a verified response coupled with a counterclaim seeking sole custody and child support. Other than these initial pleadings, child support was not mentioned again, nor was it awarded by the court.

At some point, Brooks moved from Florida to Corydon, Indiana, to live with her parents. Melton accompanied Brooks to Indiana.

An agreed order on temporary matters was executed giving Byrd temporary sole custody of the girls in his Berea home and allowing Brooks weekend visitation. Other terms prohibited the girls from being around Melton or Byrd's sixteen-year-old son unless supervised; made Brooks responsible for all transportation costs related to visitation—a roundtrip to and from Indiana each weekend—and the girls were barred from traveling to Florida. The

agreed order was drafted by counsel for Byrd. Counsel for Brooks signed the proposed order as having "seen" it, but neither parent signed the document, which the trial court entered on September 22, 2014.

An attempt at mediation—described during a case management conference as a "disaster" by Byrd's attorney—resolved the holiday schedule and honed unresolved issues to a single question—who would be named primary custodian, with both parents appearing to want to share joint custody. By December 2014, Brooks had broken up with Melton and evinced no intention to return to Florida.

The case was set for trial on February 5, 2015. Before testimony began, counsel for Brooks stated her client had received text messages from the oldest girl causing Brooks to fear the child might harm herself. The court stated it would hear the other witnesses, review the texts, and then determine whether interviewing the child would be helpful.

Proof began with Byrd testifying in his own behalf. He stated he was a long-term employee of Evans Tree Service, but had been disabled since 2010 when he was diagnosed with a cancerous tumor. After undergoing major surgery, he was told it was a permanent condition that would not improve. Six people live in Byrd's home—himself, the two girls at the heart of this appeal, his two sons—one nineteen and the other sixteen—and a granddaughter from his first marriage. He testified he supports his family with Social Security Disability income and food stamps.

Byrd testified: he takes the girls to and from doctor appointments; he identified by name their doctors, and the clinic at which they practice; the girls are current on immunizations; the girls went to the eye doctor in October and he purchased glasses for the oldest one; and, after dental checkups, the oldest girl now wears braces. The oldest girl is a fifth grader and the younger girl just started kindergarten; he identified their schools by name and testified the older girl does "real well" in school and he helps her with homework. He drives them to school each morning and they ride the bus home each afternoon.

Byrd introduced photos of his home and family members. Each girl has a bedroom (the younger one shares a room with the granddaughter) and lots of toys. There is a puppy in the household and both girls know their neighbors and have friends. Byrd stated he has volunteered to pick up the girls after visitation in Indiana a couple of times. He does not believe Brooks is employed. He testified he cooks and cleans; has a support system (his sister comes to the home daily and his sister-in-law visits often and helps watch the children); and, he believes both girls are well-adjusted. He would like his daughters to remain in Berea with their friends, schools and doctors, but he would like to share the girls with Brooks.

In response to questioning by the court, Byrd stated he has a good relationship with both sons. His oldest boy, now nineteen, was born prematurely and has the mind of a ten-year-old. He suffers from schizophrenia and is quiet. Byrd does not believe the boy would harm anyone and said he is often away from the family home.

Byrd's sixteen-year-old son is a baseball player who suffers from ADHD and oppositional defiance disorder. Byrd does not leave the children alone with his youngest son who once punched a hole in a wall in response to a telephone call. This child curses sometimes and Byrd takes away privileges to punish him for acting out. Both boys take prescribed medication.

On cross-examination, Byrd testified the family eats out about twice a week and confirmed he does not leave the girls alone with either of his sons. At one time, the oldest girl had an anxiety problem and missed a week of school—she now sees a school counselor and the difficulty has been resolved. The youngest girl missed four or five days of school. At one point he considered home schooling both girls. He stated he has no reason to suspect the oldest girl might harm herself. He described his youngest daughter as "spoiled." Finally, he acknowledged Brooks occasionally transported the girls to doctor appointments and agreed meeting her halfway to hand off the girls for visitation would be fair.

Byrd's younger sister, Sherry Jackson, testified next. A recent widow, she lives around the corner from her brother, visits the Byrd home daily, and helps with child care. She stated Byrd does it all—cooking, cleaning, washing—"more than I could do." She testified Byrd is a good cook and provides a suitable home for the girls. On cross-examination, she said she had not witnessed outbursts by Byrd's sons; believed Brooks suffers from depression; and has not really seen Brooks parent.

Ricky Abney, Byrd's neighbor, testified he has known Byrd since 2006 or 2008; Byrd mows his yard. He recalled seeing Byrd walk both girls in their strollers and described Byrd as a good father. He stated he had been inside the Byrd home and had not witnessed outbursts by the boys. On cross-examination he acknowledged Brooks is a good mother.

Byrd's sister-in-law, Delena Byrd, testified she has known Byrd more than two decades. She visits his home once a week and plays with the children. She described Byrd as a good dad who cooks, cleans, and provides the girls clothes and school supplies. She stated the boys cause her no concern. On cross-examination, she said she had nothing bad to say about Brooks as a parent and denied ever telling Brooks to leave Byrd.

Brooks was the opening witness in her own case. She testified she moved to Florida to care for her grandfather, believing she would be there a few months. Her grandfather is eighty-two, lives alone and is on dialysis. She then planned to go to Indiana, but she did not think Byrd knew that.

At the time of trial, Brooks was living with her parents in Corydon. She stated she is unemployed, not having worked for twelve years because Byrd prevented her from working outside the home. She testified she wants to return to school.

While living with Byrd, she claimed she did all the cooking and Byrd handled all the cleaning. She doubts Byrd's ability to supervise the girls because he often walks around the neighborhood and visits with Abney.

Regarding Byrd's sons, Brooks recalled a time when the youngest boy allowed her oldest daughter to ride a dirt bike which she wrecked, injuring her face. She also stated the boy punched holes in three walls. She said he has bad anger issues and while he probably would not intentionally hurt the girls, he might harm them if he did not take his medication. She characterized the oldest boy as a good kid with issues.

She testified each time she returns the girls to Berea after a visit there is trouble. She recorded the worst exchange on her cell phone which the trial court viewed. During the episode, rather than trying to calm the situation and comfort her crying daughter, Brooks responded, "That's OK, I'm getting this on video." The highly-charged exchange was witnessed by Brooks' mother and Byrd's sister-in-law.

Brooks described Byrd as having anger issues and being secretive. She said Byrd and his sixteen-year-old son curse while the girls are in the home. She said she does not communicate with Byrd and is concerned her oldest daughter may fail the fifth grade. Brooks said she never sees schoolwork or report cards.

Brooks said a one-way trip from Berea to Corydon, where her own mother lives, is 140 miles. She said her mother's family lives in Indiana. When Brooks has the girls, she takes them to the park and to the pumpkin patch.

On cross-examination, Brooks admitted her grandfather is alive and living alone without a caregiver. She admitted living in Florida with Melton who has a prior criminal history. She further stated when she left Berea on June 14, 2014, she told Byrd she would not return to Kentucky.

She explained her purpose in capturing the cell phone video of the worst exchange was her desire to show her oldest daughter did not want to stay in Byrd's home after a weekend visit in Indiana. Brooks claimed she had taken care of the girls full-time since giving birth and did not allow Byrd to discipline the girls. She described the oldest girl as not liking school at all and suffering from separation and anxiety issues. She said the girls are familiar with their Indiana relatives and Brooks' parents will help her care for the girls in Indiana until she gets a job and more education.

In response to questioning by the court, Brooks again stated she moved to Florida to care for her grandfather and took the girls with her—with Byrd's approval. Upon arriving in Florida, she admitted she and the girls moved in with Melton whom she had met in Florida when she was just thirteen. This revelation prompted the court to comment it sounded as if she had moved to Florida to live with another man.

When the court asked Brooks how she spent her time in Indiana since she was not working, she responded she would clean for her aunt—when needed. This prompted the court to ask whether she could live close to her girls in Kentucky and clean. Brooks explained she has no one in Kentucky, and said she had come to Berea in June 2008 because Byrd's father, now deceased, was ill.

In describing Byrd's trip to Florida—which ended with him retrieving the girls and returning them to Kentucky—Brooks said she approved the planned visit, which was supposed to last one week. During that time, Byrd took the girls to visit his brother and friends and then asked to extend his stay, which Brooks also approved. She testified Byrd and the girls were supposed to return to her in Winter Haven on August 18, 2014, but did not. She claims Byrd misled her, but ultimately admitted she had not told Byrd her true intentions when she originally moved the girls to Florida.

Brooks' mother, Ruby, followed her to the witness stand. She said Brooks is living with her in Indiana and is "a very good mother." She was skeptical of Byrd's parenting style because he does not discipline his two sons and he uses abusive language. She said Brooks and Byrd had twice lived with her—two months in Florida and later three months in Tennessee.

Ruby said she has worried about the girls being alone with Byrd's sons for years. She testified the sixteen-year-old boy is angry most of the time and ten years ago touched the older girl inappropriately. Perhaps the most staggering part of Ruby's testimony occurred on cross-examination when she revealed Brooks had *not* gone to Florida to care for her grandfather, but rather had gone there merely to see him and to help if he needed something. Ruby went on to say Brooks

has other family in Florida and lived with Melton and his parents while there. Ruby admitted Melton has a criminal record, but said he had not been in trouble in the last three years.

Brooks also offered testimony from Virginia Harris, a friend who lives in Berea. She testified she often saw Brooks with her family in Berea. She stated the boys were rude to Brooks and admitted she had no personal relationship with the girls.

At the close of the testimony, the trial court stated after watching the cell phone video there was no need to question the older girl. Thereafter, Byrd's attorney summarized the trial as a quest to determine who would serve as primary residential custodian for the two girls. She described Byrd as being constant and dependable, whereas Brooks left Kentucky and headed to Florida with the girls in tow. She noted in Berea the girls have ties to family, neighbors, health care, and their father's support network. She argued there was no proof Byrd could not care for the girls and requested shared custody—in Berea. In contrast, counsel for Brooks argued her client was attempting to create a stable home for the girls and emphasized the mental disorders of Byrd's two sons.

When closing arguments concluded, the trial court announced its decision, beginning with Berea is the girls' home. Brooks moved the girls to Florida to live with a complete stranger who was described as a criminal, although Melton's actual record was never introduced and his crimes [1] were never specified. The court stated Brooks' relationship with Melton

was an unstable one, patently bad for the girls, and demonstrated extremely poor judgment.

While Brooks maintained she had moved to Florida to care for her sick grandfather, the court noted her own mother negated that story, casting doubt on Brooks' credibility and leading him to believe the sole purpose for the move was to live with Melton whom the children had never met. The court deemed it curious that Brooks was concerned Byrd's two sons might harm her daughters, yet chose to live 140 miles away. The court stated it appeared Brooks was "blessed with eggs that could be fertilized, but not much maternal judgment." The court went on to say being with a mother who could not make sound decisions was not in the girls' best interest and he could not "in good conscience award joint custody." The court then addressed the cell phone video which it found to be particularly disturbing, noting the child says, "You'll just leave me." The court characterized the video as "provoked" by Brooks and something that needs to end so post-visitation exchanges will be calm.

Again, Byrd's attorney prepared the custody order. It was bare bones, stating four points about custody and visitation—in many ways parroting the prior agreed order on temporary matters. It incorporated no findings of fact or conclusions of law. The order read in its entirety:

This matter was before the Court on February 5, 2015 for a hearing to determine custody of the parties' minor children. The parties were present with their respective counsel; the Court hav-

---

1. Byrd's affidavit in support of temporary custody claimed Melton has an extensive criminal history of drug charges and walks in front of the girls in his underwear, which the oldest girl had told Byrd was upsetting. The affidavit also states Melton enters the girls'

room while they are dressing, and when asked to close the door, Melton responded, "This is my house and I'll do what I want." Finally, according to the affidavit, the "minor children have begged [Byrd] to allow them to stay in Madison County."

ing heard testimony and arguments of counsel; and being otherwise sufficiently advised; it is Adjudged and Ordered as follows:

> [Byrd] is awarded the sole custody, care and control of the parties' two (2) minor children, [M.I.B.], age twelve (12), born xx/xx/2002; and [C.M.B.], age five (5), born xx/xx/2009.

1. [Brooks] shall have visitation with the minor children from 5:00 p.m. on Friday until Sunday at 5:00 p.m. every weekend. The exchange shall take place at Dairy Queen off I-64, Exit 58 in Frankfort, Kentucky.
2. The children shall at no time be in the presence of Gary Melton, either supervised or unsupervised.
3. The children shall not be unsupervised when in the presence of [E.B.].

Again, counsel for Brooks signed off on the proposed order indicating she had "seen" it. The proposed order, without change, was signed by the trial court on February 25, 2015, and entered into the record on February 26, 2015. It is from this order that Brooks appeals.

## PROCEDURAL BACKGROUND

■■ We now embark on a discussion of whether we should consider this appeal on the merits—a highly debatable question due to multiple procedural missteps. Shortly after trial, Brooks changed attorneys. On March 6, 2015, her new counsel

filed an entry of appearance. The same day he filed a post-judgment motion[2] asking the trial court to reconsider its decision and award joint custody to both parents. The motion identified deficiencies in the order—specifically, it "contains no supporting written findings of fact and conclusions of law[,]" both of which are required by CR 52.01. *See Keifer v. Keifer*, 354 S.W.3d 123, 126 (Ky.2011); *Anderson v. Johnson*, 350 S.W.3d 453 (Ky.2011). Brooks asked that the initial custody order be declared void. Importantly, Brooks did *not* allege the trial court had failed to apply the custody factors mentioned in KRS[3] 403.270(2), an additional claim raised in this appeal.[4] An issue cannot be raised for the first time on appeal; the trial court must be given an opportunity to rule on a claim before it can be addressed by an appellate court. As is often said, an appellant "will not be permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976) *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky.2010).

While the post-judgment motion was pending, Brooks' counsel filed a notice of appeal on March 26, 2015, challenging the "order entered February 26, 2015[.]" Consideration of the post-judgment motion continued in the Madison Circuit Court, Family Division, even though filing a no-

---

2. Although not specified in the motion, it was most likely based on Kentucky Rules of Civil Procedure (CR) 52.02 which allows a trial court to "amend its findings or make additional findings and may amend the judgment accordingly." To be timely, such a motion must be filed no more than "10 days after entry of judgment[.]" Brooks' motion was timely filed. An amended post-judgment motion was filed on March 10, 2014, because the original version omitted the notice section.

3. Kentucky Revised Statutes,

4. The post-judgment motion never mentions KRS 403.270(2) nor requests application of the statutory factors pertaining to custody. The closest the motion comes is quoting *Keifer*, 354 S.W.3d at 126, which reads in part:

> Notwithstanding our conclusion that the trial court's rationale is readily determinable from the record, we state again that compliance with CR 52.01 and the applicable sections of KRS Chapter 403 requires written findings.

tice of appeal typically divests a circuit court of jurisdiction and transfers jurisdiction to this Court. *Wright v. Ecolab, Inc.*, 461 S.W.3d 753, 758 (Ky.2015).

On April 17, 2005, the trial court ruled on the post-judgment motion, entering Findings of Fact, Conclusions of Law & Custody/Visitation Order. This was entirely appropriate because filing a timely motion under CR 52.02 halts the running of time for an appeal. CR 73.02(1)(e); *see Ecolab*, at 759. The time for appeal begins running anew when an order granting or denying the motion is entered, but will be triggered only by the filing of an amended notice of appeal. CR 73.02(1)(e)(ii).

This leads us to the next procedural wrinkle in this case. We know the trial court issued a final order—containing findings of fact and conclusions of law—*not* because it is part of the appellate record certified to us, but because Brooks referenced it and appended it to her brief—a violation of CR 76.12(4)(c)(vii) which specifies in relevant part,

> [e]xcept for matters of which the appellate court may take judicial notice, materials and documents not included in the record shall not be introduced·or used as exhibits in support of briefs.

While Brooks appended the final custody order to her brief, she did not append other equally relevant post-judgment documents referenced in the briefs including "Proposed Findings" submitted by Byrd which Brooks claims the trial court copied verbatim, and her own "Reply to Petitioner Response to Post–Judgment Motions," in which she claims she tried to *guide* the trial court in applying the statutory factors listed in KRS 403.270(2), but the trial court ignored them. By providing this "guidance" as a reply to Byrd's response on the post-judgment motion, Byrd had no opportunity to refute the argument or provide his view.

On May 6, 2015, the Madison Circuit Court Clerk certified the record on appeal, including only those documents entered until and including the filing of the notice of appeal, plus the certification of the record. Any documents entered in the circuit court *after* that date—including the final order containing the findings of fact and conclusions of law the trial court ultimately issued—were *not* included in the appellate record. While the final order appended to Brooks' brief is technically in the Court of Appeals record because she attached it to her brief, it is *not* properly before us because it is not part of the certified record. Our review is limited to the certified record before us. *See Wolpert v. Louisville Gas & Elec. Co.*, 451 S.W.2d 848 (Ky.1970); *Montgomery v. Koch*, 251 S.W.2d 235, 237 (Ky.1952).

As the appellant, Brooks' responsibility was to deliver a "complete record" to us. *Steel Techs., Inc. v. Congleton*, 234 S.W.3d 920, 926 (Ky.2007). Brooks could have—and indeed should have—satisfied her burden by filing an amended notice of appeal within thirty days of entry of the final custody order. CR 73.02(1)(e)(ii) reads:

> [a] party intending to challenge a post-judgment order listed in this rule, or a judgment altered or amended upon such motion, *must file a notice of appeal, or an amended notice of appeal*, within the time prescribed by this rule measured by the date of the CR 77.04(2) docket notation regarding service of the order disposing of the last such remaining motion.

[Emphasis added]. Doing so would have resulted in the post-judgment motion practice and the final custody order being included in the certified record. Sadly, no amended notice of appeal was ever filed. This creates a dilemma. We know the trial court did the very thing Brooks claims was not done, but how do we fairly

review the appeal when the entire record is not before us.

Another equally compelling question is exactly what have we been asked to review. The only notice of appeal filed in this matter challenges the order entered on February 26, 2015, *not* the final order entered on April 17, 2015, but Brooks' brief claims even the final custody order is flawed because it omits the required statutory analysis. The only notice of appeal Brooks filed asks us to review an interlocutory order which is generally prohibited. *Ecolab*, 461 S.W.3d at 758. Yes, the original order failed to include findings of fact and conclusions of law, but that oversight has now been corrected—although Brooks is still dissatisfied with the result. Remanding the case to the trial court to do what has already been done would be an act in futility.

Some might argue we could invoke CR 75.08 and order the Madison Circuit Court Clerk to supplement the record on a theory that material items were omitted from the appellate record due to "error or accident." Then, because this is a custody case—for which exceptions are made in the law, *Ecolab*, 461 S.W.3d at 758—we could apply the relation forward doctrine *id.*, at 759, and consider the notice of appeal to be a challenge to the final order entered on April 17, 2015. However, the Court of Appeals is not in the habit of practicing cases for litigants. By stretching the well-established rules of procedure we might be able to save this appeal so it can be considered on the merits, but we are not inclined to do so. It would be unfair to Byrd to ignore the rules governing civil practice and procedure. CR 1(2). Further, we are mindful that whatever lengths to which we go in this case will be expected in all future cases and we are simply unwilling to throw out the rules—

an act that would be necessary to allow this appeal to go forward on the merits.

For the reasons set forth above, we ORDER this appeal DISMISSED for non-compliance with CR 73.02(1)(e)(ii). Additionally, we note non-compliance with CR 76.12(4)(c)(vii).

ALL CONCUR.