RENDERED:  DECEMBER 1, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0705-ME

CHRISTOPHER LOVE                                                                    APPELLANT


v.
APPEAL FROM CAMPBELL FAMILY COURT
HONORABLE ABIGAIL E. VOELKER, JUDGE
ACTION NO. 23-D-00015-001


LAUREN ELIZABETH
UNDERWOOD                                                                             APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, COMBS, AND EASTON, JUDGES.

CETRULO, JUDGE:  Appellant Christopher Love ("Love") and Appellee Lauren

Elizabeth Underwood ("Underwood") filed cross-petitions for domestic violence

orders ("DVO") against the other.  The Campbell Family Court granted

Underwood's petition, denied Love's petition, and entered a DVO against Love.

Love filed a motion to reconsider, which the family court denied.  Love now

appeals that order and the resulting amended DVO against him. Finding no error, we affirm the family court's order and amended DVO.

## FACTUAL AND PROCEDURAL HISTORY

On the evening of January 18, 2023, Love and Underwood had an altercation in the home they shared with two minor children. There had been a fight over a cell phone and Underwood called the police department claiming Love had assaulted her. Numerous officers dispatched to their residence. The officers testified that there had been a struggle, but it was not clear who initiated it; therefore, no one was arrested. The next day, Underwood filed a petition for an emergency protective order ("EPO") against Love, citing the events from the night before and alleging that there had been a history of abuse. The family court entered the EPO against Love. After he was served with the EPO, Love filed for custody of the child shared by the parties.[1] The following day, Love filed his own petition for an EPO against Underwood.

The family court conducted hearings on March 9, 2023 and April 20, 2023, to address the protective orders. At the March 2023 hearing, Officers Nogueras and Rhoden testified, along with Love. The night of the incident, Officer Nogueras briefly interviewed Love while Officer Rhoden interviewed Underwood. Officer Nogueras noted that Love had what appeared to be a red

---

[1] The older child was from Underwood's previous relationship.

-2-

mark on the back of his neck, which Love said Underwood had caused. Meanwhile, Underwood told Officer Rhoden that she was in an altercation with Love and that Love had slammed her head into a wall. Officer Rhoden did not, however, witness any red marks on her nor see any damage on the wall where Underwood alleged Love had thrown her. Officer Rhoden did notice that Underwood was visibly upset and had been the one to call the police department. The officer acknowledged that he could not say "one way or the other" whether Underwood had been assaulted.

Love then testified that Underwood had found images of Love with another woman on his iPad and alleged that he was having an affair. Love stated that the argument began because Underwood showed the photo to the children and was "cussing at [them]." Love testified that Underwood then began screaming at him and hitting him, but he did not call the police because "that is the mother of his children."[2] When asked about Underwood's allegations of past abuse, Love denied ever physically, emotionally, or sexually abusing Underwood.

At the April 2023 hearing, Officer Jaskowiac, Underwood, her friend Erin Stalker, Love, and the Cabinet for Health and Family Services ("Cabinet") supervisor overseeing the parties' custody case testified. Officer Jaskowiac

---

[2] Although the older child was from a previous relationship, Love had raised both children and considered them his own.

confirmed what the other officers had testified to and emphasized that there was some form of altercation, but he could not determine who had started it. Officer Jaskowiac further noted that he noticed the red mark on Love's neck when he arrived, but when he left, it was no longer there.

Underwood then testified that Love had assaulted her on the night of January 18, 2023, and had emotionally, physically, and sexually abused her numerous times in the past. Underwood explained that Love regularly forced her to have painful sexual encounters, had pushed her into a car, choked her when she was pregnant with her younger child, and had thrown an iPad at her face, causing a black eye.[3] Underwood explained that Love often threatened her; specifically, that he said he would "come after her" if she did not do the things he wanted and that he would kill her if she tried to take the younger child away from him.

Although she had not requested a protective order in the past "because [she] thought she needed to keep the family together," she testified that she filed one the morning after the January 18 incident because Love had slammed her head into the wall and threatened to bash her head in, which terrified her. Underwood also clarified that during the altercation on January 18, Love had grabbed her

---

[3] Underwood presented a picture of her with the black eye, and Love denied giving it to her. He also stated that he did not remember her ever having a black eye.

hands to get the phone from her and once she got a hand free from him, she hit him in the back of the neck to get him off her, which left the red mark.

Next, the Cabinet supervisor overseeing the parties' custody case testified. She explained that a plan had been put in place for the parties and, although Love initially signed the plan, he decided he was not comfortable with it, so he was not completing the tasks asked of him. Underwood was compliant with the plan. Underwood's friend, Erin Stalker, then testified that Underwood had confided in her about the past abuse and had specifically told her that Love forced her to have painful sex with him that regularly caused infections. Additionally, Erin testified that she had witnessed Love forcefully push Underwood into a car.

Love then testified again, concerning his petition for the DVO against Underwood. He reiterated the events of January 18, claiming that Underwood repeatedly hit him while he curled into a ball. He further testified that he had never pushed Underwood into a car, but that Underwood had abused him in the past by breaking plates on him and "attacking him in his bed." Love claimed that Underwood had struck the children in the past as well. He explained that he stayed in the relationship because Underwood threatened to take the children away from him and "would liquidate his home and car." Additionally, Love stated that he did not think to mention the alleged child abuse when he spoke with the Cabinet regarding custody.

At the conclusion of the April 2023 hearing, the family court reiterated that to make a finding of domestic violence, two things must be shown: (1) that an act of domestic violence occurred and (2) that it is likely to occur again. The court acknowledged that there were cross-petitions for DVOs before it: one against Love and the other against Underwood. In both cases, the family court found that the first prong had been met: that each party committed domestic violence against the other on the evening of January 18, 2023. There were marks on Love, indicating the violence, and Underwood made credible statements that Love had assaulted her as well. However, the court determined that that was "where the sameness ends." The court found that domestic violence against Love was *not* likely to happen again; however, it found that domestic violence against Underwood *was* likely to happen again. As such, the court granted Underwood's petition against Love and denied Love's petition against Underwood.

The family court explained that after hearing the evidence, it had a duty to weigh who was credible and who was not. The pictures showing Underwood's black eye concerned the court, along with her testimony that Love choked her while she was pregnant. The court found such testimony compelling as well as the testimony that on January 18, Underwood had caused redness on Love's neck because she was trying to free herself from him. The court found that it fit Officer Jaskowiac's testimony that the red mark did not stay on Love's neck

-6-

for long. Alternatively, Love's testimony that Underwood continually hit him while he was in a ball did not fit with Officer Jaskowiac's testimony because there was only one red mark and it disappeared relatively quickly.

Moreover, the court emphasized that Erin Stalker had accompanied Underwood to the hospital on numerous occasions, which the court found consistent with multiple conversations she testified she had with Underwood regarding the abuse. However, the family court did not believe Love's testimony regarding past abuse against the children because it "did not add up" that when the Cabinet, who was tasked with protecting the children, got involved, he never once mentioned that Underwood had abused the children. As such, the court denied Love's petition for a DVO and granted Underwood's.

The DVO, entered April 20, 2023, prohibited Love from committing further acts of abuse or threats of abuse, stalking, or sexual assault. Further, Love was not to have unauthorized contact with Underwood and was to remain at least 500 feet away from her and her residence. Love then filed a motion to reconsider the DVO, claiming, in pertinent part, that the family court had made a finding that both parties had engaged in domestic violence but ruled against only Love "on the likelihood that [Love] may re-offend." Love claimed the findings and DVO were inconsistent with the findings and evidence presented in the hearings.

The next month, the family court denied Love's motion to reconsider, but amended the DVO to allow the parties to communicate via AppClose.[4] The amended DVO also allowed Love to be within 500 feet of Underwood solely to exchange their minor child for visitation. The family court's order explained that testimony had shown that (1) Love committed domestic violence against Underwood when he "engaged in verbal and physical violence that created an imminent fear of harm" and (2) Love "demonstrated a history of violence within the relationship. Specifically, testimony showed [Love] choked her while she was pregnant, threw an[] ipad at her, and forced consent [for painful sexual encounters]." The court noted that it found Underwood's testimony "truthful and compelling."

Love now appeals the family court's denial of his motion to reconsider and the amended DVO entered at that time.

**STANDARD OF REVIEW**

The standard of review for factual determinations regarding domestic violence is whether the family court's findings were clearly erroneous. Kentucky Rule of Civil Procedure 52.01; *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky.

---

[4] AppClose is a co-parenting application that facilitates communication and allows the parties to manage visitation time and scheduling, make audio and video calls, and make payments.

1986).  Findings are not clearly erroneous if they are supported by substantial evidence.  *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation omitted).

> Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men.  Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses[.]

*Id.* (internal quotation marks, footnotes, and citations omitted).

## ANALYSIS

On appeal, Love argues that the family court did not make adequate findings of fact to enter the DVO.[5]  Although the introduction to Love's appellant brief mentions that he is also appealing the family court's admission of a photo at the April 2023 hearing, that argument is never raised in the body of the brief.  Therefore, the sole issue before this Court is whether the family court's denial of Love's motion to reconsider and the entry of the amended DVO were clearly erroneous.

---

[5] Additionally, Love argues that Underwood "intends to use the DVO in the custody dispute over the minor child"; however, that issue was not raised below, the family court did not make any determinations regarding such claim, and no evidence was presented to support that contention.  As such, that claim is not properly before this Court.  *See Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010) (finding the circuit court's failure to address an issue meant that issue was "not properly preserved for appellate review").

Kentucky Revised Statute ("KRS") 403.740(1) provides that a court may issue a domestic violence order if it finds "by a preponderance of the evidence that domestic violence and abuse ha[d] occurred and may again occur[.]" This Court has clarified that "[t]he preponderance of the evidence standard is satisfied when sufficient evidence establishes the alleged victim was more likely than not to have been a victim of domestic violence." *Dunn v. Thacker*, 546 S.W.3d 576, 580 (Ky. App. 2018) (citing *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007)). KRS 403.720(2) defines "domestic violence and abuse" to include physical injury, sexual abuse, assault, or the infliction of fear of the same.

Love claims that the testimony at the hearings provided evidence that both parties committed domestic violence; therefore, Love argues, the family court erred when it entered a DVO against only Love. We disagree. As the family court clearly explained, while it found that both parties had committed domestic violence on the night of January 18, 2023 – satisfying the first prong of KRS 403.740(1) – it found that only Underwood met the second prong and proved she was likely to have domestic violence committed against her again.

Love contends that this matter is similar to an unpublished case, *Aylor v. Aylor*, No. 2018-CA-000978-ME, 2018 WL 6584968 (Ky. App. Dec. 14, 2018); however, Love then immediately cites a different case, *Boone v. Boone*, 463

S.W.3d 767 (Ky. App. 2015). As such, it is unclear what similarities Love found. Nevertheless, we do not find either of the referenced cases to be dispositive here.

In *Boone*, this Court found the trial court's written findings to be inadequate. *Boone*, 463 S.W.3d at 768. There, "the only written communication from the court [was] a notation on a docket sheet in the record. Therefore, . . . the trial court's recorded findings referenced only by a handwritten note [were] insufficient." *Id.* This Court noted that while the trial court had "made adequate oral findings, . . . we are compelled to ask it to render its findings in writing." *Id.* at 769. Likewise, in *Aylor*, the court's order granting the DVO failed to adequately indicate its findings or conclusions. *Aylor*, 2018 WL 6584968, at *1. There, the order left the requisite checkboxes on the form order blank and the handwritten notations on the docket sheet order simply summarized the testimony. *Id.* Importantly, this Court emphasized that the "family court's oral findings ma[d]e no mention of whether the domestic violence and abuse may occur again" and failed to make such finding on the order of protection. *Id.* at *2.

We do not find such circumstances here. Here, the family court's oral findings were in keeping with the statute. Further, the record contains multiple detailed written orders outlining the evidence presented and the family court's findings and conclusions based on that testimony; much more than the single docket sheet notation found in *Boone*. Here, the DVO stated that Underwood had

established, by a preponderance of the evidence, that an act of domestic violence and abuse had occurred and that there was a violent history with Love. The order additionally recounted much of the testimony, highlighting the history of domestic violence.

Specifically, the family court noted Underwood's testimony that Love had "choked her when she was pregnant, threw an [i]Pad at her, verbally, and sexually assaulted her" and that Love threatened to kill her if she were to leave him. The court emphasized that it found Underwood's testimony compelling "in that there ha[d] been a history of violence within the home." Further, the order detailed Erin Stalker's testimony that she had witnessed Love push Underwood into a car and that Underwood had shared with Erin that there had been multiple instances of domestic violence in the past.

As to Love's testimony, the court order indicated that he made no statements to contradict prior acts of violence to which Underwood had testified. Further, the family court "did not find [Love's] testimony compelling or credible." Specifically, the court did not find the allegations of child abuse credible because Love failed to mention any concerns regarding the children's safety to the Cabinet worker. Additionally, Love had testified that he did not recall Underwood's black eye, but the court found that "[g]iven the severity, this seems hard to forget."

Here, the family court made the required findings, which were clearly supported by substantial evidence, and did not err when it granted Underwood's DVO against Love and denied Love's DVO against Underwood.

**CONCLUSION**

The Campbell Family Court's findings that Love committed domestic violence against Underwood and that it was likely to occur again, based on the history of domestic violence, were not clearly erroneous. As such, the Order of the Campbell Family Court is AFFIRMED.


ALL CONCUR.


BRIEF FOR APPELLANT:          NO BRIEF FOR APPELLEE.

Darrell Cox
Covington, Kentucky